## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

—————————————————————

JOHN WAYNE ,                                   :
                                               :
        Plaintiff,                             :          CIVIL ACTION
                                               :
        v.                                     :          No. 21-cv-4209
                                               :
JOHN E. WETZEL, *et al.*,                      :
                                               :
        Defendants.                            :

—————————————————————


Exhibit 1            Plaintiff's Transcript
Exhibit 2            Misconduct History
Exhibit 3            Plaintiff's Cell History
Exhibit 4            EOR Summary
Exhibit 5            2017 Vote Sheet
Exhibit 6            Tammy Ferguson Transcript
Exhibit 7            John Wetzel Transcript
Exhibit 8            George Little Transcript
Exhibit 9            DC-ADM 802
Exhibit 10           IMU Handbook
Exhibit 11           Inmate Cumulative Summary
Exhibit 12           2018 RRL Annual Review Vote Sheet
Exhibit 13           2019 RRL Annual Review Vote Sheet
Exhibit 14           Misconduct, March 5, 2020
Exhibit 15           Vote Sheet for Removal From PORTAL Program
Exhibit 16           30 Day Review, SCI-Phoenix, April 14, 2021
Exhibit 17           ICARS, dated 12/9/2021
Exhibit 18           2017 Psychological Assessment
Exhibit 19           2023 Psychological Assessment
Exhibit 20           Tabb Bickell Transcript
Exhibit 21           Plaintiff's Acknowledgement of Receipt of IMU Handbook

## STATEMENT OF FACTS

Defendant Wetzel, Bickell and Little (hereinafter "Commonwealth Defendants"), by the undersigned counsel, respectfully submits this memorandum of law in support of Commonwealth Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

### Administrative Custody and Restricted Release List

1.      Administrative Custody ("AC") is defined as "a status of confinement for non-disciplinary reasons that provides closer supervision, control, and protection than is provided in general population."  Exhibit 7, Wetzel Transcript, 7:4-7; Exhibit 9, DC-ADM 802, Section 3(A)(1).

2.      When an inmate is placed in administrative custody, whenever practical, written notice of the reasons for AC placement is given to the inmate prior to placement, but in all cases within 24 hours after placement. Exhibit 9, DC-ADM 802, Section 1(B)(6).

3.      A designation of "AC" may be appealed within the first two days of designation. Exhibit 9, DC-ADM 802, Section 2(C)(1).

4.      Inmates placed in AC status have periodic reviews as follows:

    a.  Every 7 days for the first 2 months;

    b.  Every 30 days thereafter;

    c.  After 60 days, the PRC shall interview the inmate every 90 days;

5.      The Restricted Release List is a list of inmates who may only be placed and released from Administrative Custody status upon prior approval of the Executive Deputy Secretary for Institutional Operations.  Exhibit 9, DC-ADM 802, Section 1(C) and Section 4(B).

6.      Inmates placed on the RRL are reviewed annually, by numerous DOC personnel, from both the facility and central offices, and psychological review.  Exhibit 9, DC-ADM 802, 2(D)(10).

7.      The Pennsylvania Department of Corrections houses approximately 50,000 inmates, statewide, and of that amount, an extremely limited amount of those inmates, approximately 1-3%, are placed on the RRL because they have posed a threat to the secure operation of the facility ***and*** where a transfer to another facility or jurisdiction has not alleviated the security concern.   Exhibit 7, Wetzel Transcript, 34:19-23; Exhibit 8, Little Transcript, 35:12-25; Exhibit 9, DC-ADM 802, 4-2.

8.      Criteria for placing an inmate on the RRL includes, but is not limited, to the following:

a.      Assaultive history against staff;

b.      Assaultive history against inmates;

c.      Perpetuated sexual abuse history;

d.      Escape history, or serious escape attempt; and/or

e.      Threat to the orderly operation of a facility (i.e. attempting to organize inmates, demonstrated involvement in a Security Threat Group [STG] that poses a risk to the security of a facility, etc.). Exhibit 9, DC ADM 802, 4-2.

9.      To initiate a placement on the RRL, the assigned counselor of the subject inmate initiates a DC-46, Vote Sheet, and supporting documentation related to the justification for the recommended placement, including a psychological review of the inmate, completed within 6 months of the review, and forwards to the Unit Manager.  *Id.*

10.     The Unit Manager then initiates an RRL Form, provides justification for their recommendation on the RRL, and submits the form and packet for routing to various personnel of the DOC, who also provide their written justification supporting their approval or disproval of the placement.  *Id.*

3

11.     The vote sheet is circulated to the major of the guard, psychology, Deputy for Centralized Services, Deputy for Facility Management, the Facility's Superintendent, the Corrections Classification Program Manager and the Regional Deputy Secretary.  Exhibit 6, Ferguson Transcript, 15:15-22; 16:2-7; 29:14-24; 31:3-17.

12.     After those reviews are complete, the vote sheet is then passed to the Executive Deputy Secretary for Institutional Operations ("EDSI"), who has final authority over the placement, continuation or removal of an inmate from the RRL.  Exhibit 9, DC ADM 802, 4-2; Exhibit 6, Ferguson Transcript, 15:15-22; 16:2-7; 29:14-24; 31:3-17.

13.     For placement and removal, the EDSI conducts an interview of each inmate before a final determination is made. *Id.*

## PORTAL AND Intensive Management Unit

14.     The Pennsylvania DOC has been developing programs for inmates placed on the RRL to create a path back to general population.  Exhibit 7, Wetzel Transcript, 10:12-15.

15.     The pre-cursor program to the Intensive Management Unit ("IMU") was the Positive Outcome Restructuring Through Assessments and Learning ("PORTAL") program, which was a specialized unit for inmates placed on the RRL, which no longer exists.  Exhibit 6, Ferguson Transcript, 20:13-18.

16.     The PORTAL was a four-phase program, with Phase 4 conducted in two parts, created to address the violent behavior of inmates that caused them to be placed on the Restricted Release List in the first place.  Exhibit 6, Ferguson Transcript, 20:18 – 21:5.

17.     The Intensive Management Unit ("IMU") is a relatively new program, beginning in June 2021, that replaced PORTAL and similarly created a path for inmates with assaultive histories to work toward removal from the RRL, and back to general population, through a combined approach of a very structured environment, with programming designed to reduce

RRL inmates' proclivity for violence.  Exhibit 7, Wetzel Transcript, 9:24 – 10:15, 11:19-22, 29:13-15.

18.     The IMU provides socialization opportunities for individuals confined to Security Level 5 (SL5) settings, specifically those inmates who are on the RRL.   Exhibit 10, IMU Handbook, DOC 0000002.

19.     The goal of the IMU is to identify the prior thoughts and behaviors necessitating IMU placement and to provide the skills necessary to overcome them and reintegrate into a general population setting.  Exhibit 10, IMU Handbook, DOC 0000002.

20.     The programming that is offered in the IMU is based on an approach called the "Yield Theory," which can be described as a psychological approach to anger management and violence reduction, with the use of journaling and support from trained case workers, in group settings, multiple times per week.  Exhibit 7, Wetzel Transcript, 77:20 – 78:7.

21.     The IMU program uses a 6-tiered phase system based on the inmate's adjustment and attainment of goals/objectives and is designed to be a three-year program that progressively increases inmates' privileges until their removal from RRL, and back into general population in Phase 1 of the program.  Exhibit 10, IMU Handbook, DOC 0000002; Exhibit 6, Ferguson Transcript, 33:16-18; Exhibit 1, Plaintiff's Transcript, 49:13-21.

22.     The tiered phase system was developed based upon American Correctional Association's best correctional practices.  Exhibit 7, Wetzel Transcript, 54:5-11.

23.     Phase 6 of the IMU is the most restrictive phase, and, therefore, has an abbreviated timeframe of only 30 days in length.  Exhibit 10, IMU Handbook, DOC 0000003; Exhibit 6, Ferguson Transcript, 72:5-9.

24.     With each phase of the IMU comes more privileges, including more out-of-cell time, more opportunities to gather with small groups, and more opportunities for outside contact. Exhibit 10, IMU Handbook, IMU Services and Privileges Chart, DOC 0000013-14.

25.     ***Even at the most restricted level*** of the IMU, Phase 6, an inmate still receives the following privileges: 2 hours per day of exercise out of cell, 7 days per week; 1 phone call per week; video visits 1 time per week; kiosk privileges; radio/tv privileges; in-cell programming; weekly unit management contact and psychological contact as required by DOC 13.8.1; showers 3 times per week; commissary privileges; access to mini law-library and recreational book; and in-cell games, like puzzles.  *Id.*

26.     As a point of comparison, anything above three hours out-of-cell per day is consistent with the privileges of general population inmates.  Exhibit 7, Wetzel Transcript, 46:25 – 47:2.

27.     Within only ***30 days*** of being placed in the IMU, an inmate is moved from Phase 6 to Phase 5, where they are given increased privileges.  *Id.*

28.     The Program Committee ("PRC") is the deciding body for progressing an inmate through the phases of the IMU, with the exception of moving from Phase 2 to Phase 1, which entails the removal of an inmate from the RRL.  Exhibit 6, Ferguson Transcript, 58:3-7.

29.     PRC Reviews are conducted **every 90** days, if not sooner.  Exhibit 6, Ferguson Transcript, 72:5-16.

30.     By Phase 2 of the IMU, an inmate receives the following privileges: 3 hours per day of exercise, out of cell, 7 days per week, with up to 2-3 other inmates; 4 phone calls per week; 4 tablet/kiosk (email) connections per week; up to 6 video visits per month; tv/radio privileges; participation in group treatment; weekly unit management contact and psychological contact as required by DOC 13.8.1; showers 5 times per week; increased spending limit in

commissary; group study; access to mini law library and 3 recreational books; ability to congregate in small groups for games like chess, checkers and dominoes; ability to participate in employment; and one meal per day with other Phase 2 or 3 inmates.

31.     Once Phase 2 is completed, inmates are recommended for removal from the RRL and placed in general population for completion of Phase 1, where the inmates enjoy all general population privileges.

### Plaintiff's Violent History Leading To Placement On RRL

32.     Plaintiff is an inmate with an extremely violent propensity.  Exh 1, Plaintiff's Dep, 10:3-4.

33.     Plaintiff has 44 upheld misconducts since his imprisonment.  Exh 2, Plaintiff's Misconduct History.

34.     Plaintiff was originally sentenced to execution and concurrent life sentences for two counts of murder in the First degree on July 26, 1995.  Exh 11, ICSA.

35.     On March 15, 2013, Plaintiff's execution sentence was lifted and he was re-sentenced to life for murders on two counts.  Exh 11, ICSA.

36.     Plaintiff was first placed in the former State Correctional Institution (SCI) at Graterford.  Exh 3, Plaintiff's Cell History.

37.     Plaintiff was transferred from SCI-Graterford to SCI-Huntington on September 25, 2014, after he attempted to stab two inmates on January 17, 2014.  Exh 2, Plaintiff's Misconduct History; Exh 3, Plaintiff's Cell History; Exhibit 4, EOR Summary, DOC 0001648.

38.     As a result, Plaintiff was issued 120 days of disciplinary custody.  Exh 2, Plaintiff's Misconduct History.

39.     While at SCI-Huntington, Plaintiff incurred two more misconducts for fighting, the latter of which was a fight on March 11, 2016, in which Plaintiff used a lock that he tied to an

extension cord, to assault another inmate.  Exh 1, Plaintiff's Transcript, 12:15 – 13:2, 14:14-22; Exh 2, Plaintiff's Misconduct History; Exhibit 4, EOR Summary, DOC 0001648.

40.     As a result, Plaintiff received 120 days of disciplinary custody and was transferred from SCI-Huntington to SCI-Fayette on September 8, 2016. Exh 1, Plaintiff's Transcript, 12:15 – 13:2, 15:10-12; Exh 2, Plaintiff's Misconduct History; Exh 3, Plaintiff's Cell History.

41.     On October 13, 2016, Plaintiff engaged in another assault at SCI-Fayette where he struck an inmate in the head with a lock in a sock, resulting in injuries to the inmate that required hospitalization.  Exh 1, Plaintiff's Transcript, 15:20-22, 17:8-11, 18:6-14, 22:6-12; Exhibit 4, EOR Summary, DOC 0001646.

42.     As a result, Plaintiff received 90 days of disciplinary custody and transfer from SCI-Fayette to SCI-Albion on March 2, 2017.  Exh 2, Plaintiff's Misconduct History; Exh 3, Plaintiff's Cell History.

43.     At SCI-Albion, Plaintiff incurred two more misconducts; one on July 11, 2017, during which a random search of Plaintiff's cell yielded a homemade weapon concealed in Plaintiff's wall locker, and one for assault on March 27, 2017, at which time Plaintiff struck another inmate with a closed fist, resulting in 90 days of disciplinary custody. Exhibit 4, EOR Summary, DOC 0001644.

44.     As a result of these incidents, Plaintiff received 30 days and 90 days of disciplinary custody, respectively. Exh 2, Plaintiff's Misconduct History.

45.     Then, on September 3, 2017, Plaintiff incurred 3 more misconducts for the violent and unprovoked assault of 3 inmates with a lock attached to an extension cord.  Two of the attacked inmates were severely injured, one of whom needed to be transported to the hospital.

Exhibit 1, Plaintiff's Transcript, 25:7-21; 35:5-7, 22-24; Exh 2, Plaintiff's Misconduct History; Exhibit 4, EOR Summary, DOC 0001644.

46.    Plaintiff testified that, it was not until ***Plaintiff's last three assaults on three different inmates, that Plaintiff was finally recommended for, and approved, for placement*** on the Restricted Release List, which was approved by the Secretary on December 22, 2017. Exhibit 1, Plaintiff's Transcript, 36:11-13; Exhibit 5, 2017 Vote Sheet.

**<u>Plaintiff's Continued Violence On RRL And Failed Attempt In PORTAL Program</u>**

47.    Once placed on the RRL, Plaintiff continued to incur misconducts for his violent behavior. Exhibit 1, Plaintiff's Transcript, 36:18-20; Exh 2, Plaintiff's Misconduct History.

48.    On August 29, 2018, Plaintiff received a misconduct for throwing feces, mixed with urine, at a corrections officer, striking him with it in the face, shoulder, chest and leg, and another inmate, striking him with it in the arm and side, resulting in 180 days of disciplinary custody. Exhibit 1, Plaintiff's Transcript, 36:21-24, 37:1-8; Exh 2, Plaintiff's Misconduct History; Exhibit 4, EOR Summary, DOC 0001644-45.

49.    On April 30, 2020, Plaintiff received another misconduct for throwing and striking another inmate with feces, resulting in 90 days of disciplinary custody. Exh 2, Plaintiff's Misconduct History; Exhibit 4, EOR Summary, DOC 0001650.

50.    In the 2018 Annual Review of Plaintiff for his continuation on the RRL, which was conducted between September 2018 and November 2018, and approved by the Secretary in January 2019, Plaintiff's violent history and assault involving throwing feces at an officer, were noted in a unanimous vote to continue Plaintiff on the Restricted Release List.  Exhibit 12, 2018 Vote Sheet.

51.    In 2019, Plaintiff incurred two more misconducts for refusing to obey an order and sexual harassment.  Exhibit 13, 2019 Vote Sheet.

9

52.     Based upon Plaintiff's continued misconducts, between July and September 2019, Plaintiff received a unanimous vote, which was approved by the Secretary, to be kept on the RRL; however, Plaintiff was recommended for PORTAL, a step-down program, in an effort to provide Plaintiff a path back to general population.  Exhibit 13, 2019 Vote Sheet.

53.     Within months of his annual review recommending a step down program, on November 13, 2019, Plaintiff was placed in PORTAL at SCI-Pine Grove.  Exhibit 3, Plaintiff's Cell History.

54.     However, Plaintiff continued his violent behavior and incurred another misconduct while in PORTAL when, on March 5, 2020, Plaintiff threw a brown liquid, "smelling and having the appearance of feces," on a corrections officer. Exhibit 1, Plaintiff's Transcript, 37:9-24; Exh 2, Plaintiff's Misconduct History; Exhibit 14, March 5, 2020 Misconduct, DOC 0000135.

55.     On March 6, 2020, Plaintiff received a unanimous vote for his removal from the PORTAL program based upon his assault on March 5, 2020, lack of motivation to continue the program, and continued assaultive behaviors.  Exhibit 15, Vote Sheet for removal from PORTAL, DOC 0000149.

**Plaintiff's Placement In IMU And Success In IMU Program**

56.     On April 8, 2021, Plaintiff was transferred to SCI-Phoenix to be placed in the newly-developed IMU to, again, address Plaintiff's violent proclivities, while providing Plaintiff a step-down program back to general population.  Exhibit 16, 30 Day Review, SCI-Phoenix, April 14, 2021.

57.     Upon his transfer from SCI-Forest to SCI-Phoenix, Plaintiff was advised that he would continue the privileges he'd earned at SCI-Forest, which included: 2 phone calls per week

and access to the kiosk 1 time per week. Exhibit 16, 30 Day Review, SCI-Phoenix, April 14, 2021.

58.     On December 9, 2021, Plaintiff was placed in Phase 5 of the IMU, which if completed with success, is 9 months' in length.  Exhibit 17, ICARS, Entry, December 9, 2021; Exhibit 10, IMU Handbook, DOC 0000003; Exhibit 1, Wayne Transcript, 62:13-18.

59.     Plaintiff was provided with an IMU handbook, which provided him a clear path to his reintegration into the general population, including behavior expectations, programs and coursework that needed to be completed and approved, and projected time-frames for each phase of the program until ultimate removal from RRL and back to general population.  Exhibit 10, IMU Handbook, DOC 0000003; Exhibit 21, Plaintiff's Acknowledgement of Receipt of IMU Handbook

60.     Almost precisely 9 months after Plaintiff was placed in Phase 5 of the IMU, on July 6, 2022, Plaintiff timely progressed to Phase 4 of the IMU, another phase of 9 months in duration, which would require attendance at group programming, completion of assigned work and continued status of misconduct-free behavior, for progression.  Exhibit 10, IMU Handbook, DOC 0000003; Exhibit 17, ICARS, Entries: December 9, 2021; January 20, 27, 2022; February 3, 18, 25, 2022; April 18, 26, 2022; May 24, 2022; June 21, 28, 2022; July 5, 6 2022.

61.     With the progression from Phase 5 to Phase 4, Plaintiff gained more privileges, including more out-of-cell time, more opportunities to congregate in small groups, more connections to family/friends via video and phone, more showers, and increased spending at the commissary.  Exhibit 10, IMU Handbook, IMU Services and Privileges Chart, DOC 0000013; Exhibit 1, Wayne Transcript, 62:19-22.

62.     Almost precisely 9 months after he began Phase 4, on April 5, 2023, Plaintiff timely progressed to Phase 3 of the IMU, another phase of 9 months in duration, which would

similarly require attendance at group programming, completion of assigned work and continued

status of misconduct-free behavior, for progression.  Exhibit 10, IMU Handbook, DOC 0000003;

Exhibit 17, ICARS, Entries: July 12, 2022; August 12, 2022; September 15, 2022; April 5, 2023;

Exhibit 1, Wayne Transcript, 63:2-9.

   63. With the progression from Phase 4 to Phase 3, Plaintiff, again, gained more

privileges, including: 3 hours of out-of-cell time, with the ability to congregate with up to 4

inmates during that time; 4 phone calls per week, 4 tablet/kiosk connections per week – allowing

Plaintiff to access to his support system outside of the prison; participation in group treatment

and group study on the unit; up to 3 meals per week with other inmates; ability to congregate

with other inmates for games like checkers and dominos; access to a law library; increased

allowances at commissary; access to personal property permitted by DC ADM 815; 4

unrestrained showers per week; unrestricted access to both a tv and radio.   Exhibit 10, IMU

Handbook, IMU Services and Privileges Chart, DOC 0000014; Exhibit 1, Wayne Transcript, 64:

17-23; 71:13 – 78:24.

   64. Plaintiff testified that he is currently scheduled for progression from Phase 3 to

Phase 2 on December 5, 2023, which is the least restrictive phase of the IMU before being

released from RRL status to general population for Phase 1 of the IMU.  Exhibit 10, IMU

Handbook, DOC 0000003; Exhibit 1, Wayne Transcript, 65: 10-16, 80:6-8.

   65. Once in Phase 2, Plaintiff will enjoy the following additional privileges: 3 hours

per day of exercise, out of cell, 7 days per week, with up to 2-3 other inmates; 4 phone calls per

week; 4 tablet/kiosk (email) connections per week; up to 6 video visits per month; tv/radio

privileges; participation in group treatment; weekly unit management contact and psychological

contact as required by DOC 13.8.1; showers 5 times per week; increased spending limit in

commissary; group study; access to mini law library and 3 recreational books; ability to

congregate in small groups for games like chess, checkers and dominoes; ability to participate in employment; and one meal per day with other Phase 2 or 3 inmates.

66.   Plaintiff admits that he has no reason to believe that he will not progress to Phase 2 on December 5, 2023, and confirmed his understanding that his future on the RRL is determined by him and his success in the program, stating "I'm the only person who can give myself a reason not to make it," explaining further that, "What I mean, like, if I messed up, like if I caught a misconduct, then that would be on me.  But I'm not putting myself in that position not to make it there.  Like I told you earlier, I'm doing everything that I'm supposed to do to get there and get through this program."  Exhibit 1, Wayne Transcript, 80:15-23.

67.   Plaintiff's conditions of confinement in the IMU do not constitute solitary confinement.  Exhibit 7, Wetzel Transcript, 17:23-25, 18:5-6; Exhibit 20, Bickell Transcript: 13:2-8, 17-25; 14:1-8; Exhibit 8, Little Transcript, 17:11-20; Exhibit 6, Ferguson Transcript, 99:19-22, 106:6-9.

68.   Plaintiff admits that he has *finally* had success in maintaining misconduct-free behavior since his placement in the IMU.  Exhibit 1, Wayne Transcript, 81:24 - 82:3.

69.   Plaintiff agrees that once he completes Phase 2, which he begins on December 5, 2023, he will be removed from RRL and progressed to Phase 1, which is general population. Exhibit 1, Wayne Transcript, 81:4-14.

70.   Plaintiff's projected removal from RRL, back to general population, is August 2024.  Exhibit 10, IMU Handbook, DOC 0000003.

71.   Plaintiff admits that the IMU has served its stated purpose of reintegrating Plaintiff back into general population, with a vision toward misconduct-free behavior, stating that he intends to remain misconduct free because, "I know I can't – anything I do, I wasn't

going to end up back in IMU.  So if I had a problem, all I can do is report it to authority before

things get out of hand. I have to." Exhibit 1, Wayne Transcript, 87:8-14.

72.     This is a vast improvement from Plaintiff's position in 2017, prior to his

placement on the RRL, at which time, Plaintiff told a psychologist that the inmates that he

severely assaulted were "imposing their homosexual views" upon him so he staged the assault so

that everyone would know not to "come at him again," expressing his complete justification for

the assaults that sent one inmate to the hospital.  Exhibit 18, 2017 Psychological Evaluation,

DOC 0001571.

73.     Plaintiff has been, and remains, psychologically stable, without any indication of

suicidal ideation, as acknowledged by Plaintiff.  Exhibit 1, Wayne Transcript, 89:17-21; Exhibit

18, 2017 Psychological Evaluation, DOC 0001563; Exhibit 19, 2023 Psychological Evaluation,

DOC 0001517.

74.     In Plaintiff's most recent Psychological Evaluation, conducted as late as July 24,

2023, Plaintiff's mood "appeared to be within normal limits and his affect was congruent to his

mood." Exhibit 19, 2023 Psychological Evaluation, DOC 0001517.

75.     Additionally, Plaintiff reported that he was maintaining healthy exercise and good

eating habits, and ***specifically denied*** any significant mood issues, anxiety, depression or mania,

and did not present to be in any psychological distress.  Exhibit 19, 2023 Psychological

Evaluation, DOC 0001517.

76.     Plaintiff makes no allegation that he has been denied medical treatment, and,

although Plaintiff makes various claims about psychological and sleep disturbances, Plaintiff

admits that he has never requested a medical visit for treatment or medication for any of the

complaints he asserted in his Complaint.  Exhibit 1, Wayne Transcript, 92:18 – 93:2.

<u>**Defendants' Official Positions and Retirement Status**</u>

77.     John Wetzel was the Secretary of the Department of Corrections from 2011 until his retirement in 2021.  Exhibit 7, Wetzel Transcript, 4:14-17.

78.     George Little was the Acting Secretary of the Department of Corrections from October 2021, until March 2023.  Exhibit 8, Little Transcript, 5:1-4.

79.     Prior to becoming Acting Secretary of the Department of Corrections, Little had nothing at all to do with the inception or continuation of the IMU.  Exhibit 8, Little Transcript, 9:15-19, 10:5-8.

80.     During the time that Little was Acting Secretary, there was a very short window of time of less than one month, where Little retained final authority on placement, continuation or removal of inmates from the RRL, before delegating it in November 2021, going forward, to the Executive Deputy Secretary for Institutional Operations ("EDSI"), who at the time, was Tabb Bickell.  Exhibit 8, Little Transcript, 5:12-15; 6:9-15; 16:16-18.

81.     Little only conducted one RRL review before delegating the final authority on the placement, continuation or removal of inmates from the RRL to the EDSI.  Exhibit 8, Little Transcript, 5:12-15.

82.     Little did not, nor does not, know Plaintiff, nor did he review Plaintiff's case prior to the inception of this lawsuit.  Exhibit 8, Little Transcript, 23:23.

83.     George Little was succeeded by Laurel Harry as Acting Secretary of the Department of Corrections on January 17, 2023. Exhibit 8, Little Transcript, 5:5-7.

84.     Laurel Harry was confirmed by the Pennsylvania Senate as Secretary of the Department of Corrections on June 22, 2023.

(https://www.cor.pa.gov/Pages/Secretary%20of%20Corrections.aspx).

85.     Secretary Harry does not, and has not, had authority over Plaintiff's placement, continuation or removal from the RRL.  Exhibit 9, DC ADM 802, 4-2.

86.     Tabb Bickell, the former EDSI, was succeeded by former Acting EDSI, Tammy Ferguson, in April 2023, until her retirement in November 2023.  Exhibit 6, Ferguson Transcript, 6:7-10.

87.     Although Ferguson had final authority on the placement, continuation or removal of inmates from the RRL, from April 2023 until November 2023, she never reviewed Plaintiff for placement, continuation or removal from the RRL because he was not up for his annual review during her tenure as EDSI.  Exhibit 6, Ferguson Transcript, 6:21-24.


                              Respectfully submitted,

                              MICHELLE A. HENRY
                              Attorney General


                              /s/  Sarina Kaplan
                              _____

                              Sarina Kaplan
Office of Attorney General          Senior Deputy Attorney General
1600 Arch Street, Suite 300         Attorney I.D. No. 209738
Philadelphia, PA 19103
Phone: 215-560-2127                 Karen M. Romano
Fax: 717-772-4526                   Chief Deputy Attorney General
skaplan@attorneygeneral.gov

**CERTIFICATE OF SERVICE**

I, Sarina Kaplan, hereby certify that the attached Motion for Summary Judgment has been

filed electronically on November 28, 2023, and is available for viewing and downloading from the

Court's Electronic Case Filing System.


By      s/ Sarina Kaplan
                                        Sarina Kaplan
Office of Attorney General              Senior Deputy Attorney General
1600 Arch St., Suite 300                Attorney I.D. No. 209738
Philadelphia, PA 19103
Phone: (267) 768-3964                   Karen M. Romano
Fax:    (717) 772-4526                  Chief Deputy Attorney General
skaplan@attorneygeneral.gov             Civil Litigation Section