**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| John Wayne, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 21-cv-4209 |
| John E. Wetzel, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF LAW OF JOHN WAYNE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Samuel W. Silver
ssilver@welshrecker.com
Richard D. Walk, III
rwalk@welshrecker.com
WELSH & RECKER, P.C.
306 Walnut Street
Philadelphia, PA 19106
(215) 972-6430

*Attorneys for Plaintiff John Wayne*

Dated: December 12, 2023

# Table of Contents

I.  INTRODUCTION ...........................................................................................................1

II.  BACKGROUND ...........................................................................................................1

III.  ARGUMENT ...............................................................................................................4

    A.  Defendants' motion to dismiss Mr. Wayne's claims as moot should be denied. ..............4

    B.  Defendants' motion for summary judgment should be denied because there are numerous disputed issues of material fact related to the elements of his § 1983 claims. ..........................................................................................................................6

        1.  Defendant Ferguson had personal involvement in the alleged wrongdoing. .............7

        2.  Defendants are not entitled to summary judgment on Mr. Wayne's Eighth Amendment Claim. ..............................................................................................8

        3.  Defendants are not entitled to summary judgment on Mr. Wayne's Fourteenth Amendment Claim. ................................................................................12

    C.  Qualified immunity does not bar Mr. Wayne's claims, and his clearly established rights have been violated. ............................................................................22

IV. CONCLUSION ............................................................................................................23

# Table of Authorities

## CASES

*Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210 (3d Cir. 2015)..................................................7

*Clark v. Coupe*, 55 F.4th 167 (3d Cir. 2022)................................................................................8, 11

*CNX Midstream Devco I LP v. Applied Constr. Sols., Inc.*,
    2021 WL 3930688, at *3 (W.D. Pa. Sept. 21, 2021)..................................................................6

*Decker v. Nw. Envtl. Def. Ctr.,* -- U.S. --, 133 S.Ct. 1326, 1335 (2013))......................................4

*Del. Riverkeeper Network v. Sec. Penn. Dep't of Environmental Protection*,
    833 F.3d 360 (3d Cir. 2016)........................................................................................................4

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................................22

*Hewitt v. Helms*, 459 U.S. 460 (1983) ..........................................................................................18

*In re Cont'l Airlines*, 91 F.3d 553 (3d Cir. 1996))..........................................................................4

*Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368 (3d Cir. 2019) ..............................................8

*Mayo v. Wetzel*, No. 1:18-CV-878, 2021 U.S. Dist. LEXIS 159845, at *20 (M.D. Pa. Aug. 24,
    2021)......................................................................................................................................8, 13

*Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017) ........................................................9, 11, 13

*Porter v. Pennsylvania Dep't of Corrections*, 974 F.3d 431 (3d Cir. 2020) ...........................8, 23

*Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988) ....................................................................7

*Saucier v. Katz*, 533 U.S.223, 236 (2009) ....................................................................................22

*Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)........................................................................12

*Shoatz v. Wetzel*, No. 2-13-cv-0657, 2016 WL 595337, at *11 (W.D. Pa. Feb. 12, 2016) .... 12, 17

*Talley v. Clark*, 851 F. App'x 306 (3d Cir. 2021) ....................................................................8, 13

*Thomas v. Tice*, 948 F.3d 133 (3d Cir. 2020) .................................................................................8

*Tolan v. Cotton*, 572 U.S. 650 (2014).............................................................................................6

*Williams v. Secretary Pennsylvania Dep't Corrections*,
    848 F.3d 549 (3d Cir. 2017)....................................................................................12, 17, 23

*Williams v. Wetzel*, No. CIV.A. 12-944, 2014 WL 252020, at *6 (W.D. Pa. Jan. 22, 2014) *aff'd
    sub nom*, *Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017) ....................14

## RULES

Fed. R. Civ. P. 56(a) .......................................................................................................................6

## I.      INTRODUCTION

In seeking summary judgment, defendants ask the Court to accept a one-sided version of the facts that in many respects is not borne out even by their own inconsistent and uncertain testimony. But even if it were, defendants' story is laden with myriad facts that are contested by plaintiff and that a jury should weigh and decide.  On critical issues ranging from the actual conditions of plaintiff John Wayne's confinement and the hardship they present, to the procedure that defendants have (or have not) followed in perpetuating Mr. Wayne's restricted confinement and whether there will ever be an end to that confinement, the record is uncertain at best. Accordingly, defendants' request that the Court grant them summary judgment should be denied.

## II.      BACKGROUND

Mr. Wayne is incarcerated at SCI Phoenix, where he has been continuously confined to a restrictive housing unit ("RHU") since 2017. In 2021, he was assigned to the Department of Corrections' then-new Intensive Management Program ("IMU"), which is a 6-phase program that defendants say is designed to give certain eligible incarcerated persons a "path" out of restrictive housing and back into the general prison population. By definition, of course, those persons housed in the RHU and assigned to the IMU are under conditions that are different than those who are in the general population.

By defendants' admissions, the IMU operates as a reward system.  If a person assigned to the IMU behaves well, that person gets minor adjustments to his conditions – a smidgen of additional time out of cell, and the privilege of being able to use a tablet for certain email, for example. And in order for this system to function as a way to control the behavior of its subjects, two elements are critical and indisputable: First, no matter what adjustments to the conditions are made along the way, the conditions of confinement must remain undesirable – if this were not the case, then there would be no reward at the end of the "path."  Second, success for an individual must not be guaranteed – if success were guaranteed, then the element of control over

an individual's behavior would be compromised.  Defendants appear to contest both of these basic notions (and more), essentially arguing to the Court that the conditions to which they have subjected Mr. Wayne since 2017 are not all that bad, and assuring the Court that in any event, it is just a matter of time before Mr. Wayne's banishment to restrictive housing will end.  But the evidence on both of these topics is sharply disputed.

A major facet of defendants' summary judgment argument is their assertion that because Mr. Wayne's conditions have been changed since he filed suit (and since this Court denied defendants' motion to dismiss his suit, ECF No. 41), Mr. Wayne no longer has a basis to assert that he is being deprived his constitutional rights. They note, among other details, that because he has progressed through "phases" of their IMU program, he now enjoys the privilege of being able to move beyond the walls of his cell for one additional hour per day. Mr. Wayne does not dispute this basic fact. However, Mr. Wayne does dispute the materiality of this change and whether it impacts his constitutional claims, and he believes that these are issues that the jury must resolve.

Mr. Wayne also disputes defendants' second critical assertion – that the IMU purportedly is a clear, certain, guaranteed path back to general population.  Rather, the evidence will support a jury finding that progression through the phases of the IMU is arbitrary and indecipherable. First, while defendants feign that an individual is in control of whether and when he will progress from phase to phase and ultimately return to general population, in reality there are "mandatory minimum" stays in each phase that defendants have applied to Mr. Wayne.  Thus, while his record has for three-plus years been utterly incident free, defendants nonetheless assert that the time for him to return to general population has not yet come.

At the same time, defendants' testimony has been inconsistent on whether Mr. Wayne could be "accelerated" such that he need not pass through each phase of the IMU before returning to

general population.  The testimony has been that some individuals have received that treatment and that defendants have the ability to accelerate an individual's path.  But each time a defendant has been pressed to explain why John Wayne would not be such an individual given his perfect record, they have resorted to citing Mr. Wayne's years-ago conduct and saying without any explanation, "Therefore he needs to wait longer."  Particularly given defendants' representation in their summary judgment motion that Mr. Wayne has been "thriving" in their program (Defs' Br. at 6), this behavior makes no sense and smacks of being an inconsistent practice that is based on nothing and surely does not constitute due process.  Indeed, in both 2020 and 2021, Mr. Wayne did not receive a review that purportedly was required pursuant to DOC internal policies. Throughout his time in restrictive confinement, Mr. Wayne's Program Review Committee ("PRC") reviews similarly failed to sufficiently protect him from a deprivation of his rights without due process of law. The PRC review reports fail to specify the reasons for continuations of Mr. Wayne's prolonged confinement, despite that a section of the Department of Corrections's PRC review form requests that exact information. Third, defendants apparently want the Court to believe that if Mr. Wayne were to just accept that he needs to keep waiting, he will ultimately be released to general population.  But even the completion of the IMU program does not guarantee that Mr. Wayne will be placed back in the general population.

The reality is that Mr. Wayne has not received a single misconduct in over three years, but he is forced to wait out arbitrary "phases" that have no discernable difference in programming or treatment goals. He is thus being held in an extremely restrictive setting without any penological justification. The conditions in the IMU remain an atypical and significant hardship and, particularly in the context of the length of Mr. Wayne's indefinite confinement, they violate the Eighth and Fourteenth Amendments.

3

The material factual disputes and the ongoing violations of Mr. Wayne's constitutional rights require the denial of defendants' summary judgment.

## III.   ARGUMENT

### A.  Defendants' motion to dismiss Mr. Wayne's claims as moot should be denied.

Defendants argue that this Court no longer has jurisdiction over Mr. Wayne's claims under Article III because there is no longer a case or controversy between the parties. The gist of their argument is that Mr. Wayne's conditions have changed since he first filed suit.  But this misses the point.  As Mr. Wayne asserted in his recent motion to amend and file a Second Amended Complaint, his conditions remain constitutionally intolerable.

A case is moot "'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Del. Riverkeeper Network v. Sec. Penn. Dep't of Environmental Protection*, 833 F.3d 360, 375 (3d Cir. 2016) (quoting *Decker v. Nw. Envtl. Def. Ctr.,* -- U.S. --, 133 S.Ct. 1326, 1335 (2013)). In *Riverkeeper Network*, the Third Circuit rejected an argument that a petition for review of permitting decisions made by the Pennsylvania Department of Environmental Protection on a proposed construction project was moot even after construction was completed, because it could still provide petitioners some relief. Indeed, "[w]hen a court can fashion 'some form of meaningful relief' or 'impose at least one of the remedies enumerated by the appellant,' even if it only partially redresses the grievances of the prevailing party, the case is not moot." *Id.* (quoting *In re Cont'l Airlines*, 91 F.3d 553, 558 (3d Cir. 1996)).

Defendants argue that Mr. Wayne's progression through the phases of the IMU program render his claims for declaratory and injunctive relief moot. Yet, as discussed below, the conditions of Mr. Wayne's confinement are the functional equivalent of solitary confinement[1].

---

[1] While defendants conveniently were consistent in their adamant denials that Mr. Wayne is in solitary confinement, they ultimately admitted that they do not actually operate under a definition

As discussed more fully below, they pose a serious risk of substantial harm and are completely without penological justification, in violation of the Eighth Amendment, and constitute atypical and significant hardship, depriving Mr. Wayne of his rights without sufficient due process in violation of the Fourteenth Amendment.

Defendants also argue that Mr. Wayne's claims are moot because he purportedly was to be moved to Phase 2 of the IMU on December 5, 2023, before this response became due. Defs' Br. at 6, 13, 18.  That would not have been a basis to render his claims moot.  But in any event, defendants' assertion is factually incorrect. As of the date of this filing, Mr. Wayne remains in Phase 3 of the IMU. Plf's Ex. 1 (Dec. 11-12, 2023 e-mail exchange between R. Walk and J. Wayne). Although he testified at deposition that he *thought* he would become *eligible* to be phased down on December 5, 2023, Mr. Wayne of course has no idea whether or when defendants will actually take action – that is part of why he is suing in the first place. *See* Defs' Ex. 1, at 80:6-8 ("Q. When do you believe you're *qualified* to move from phase three to phase two? A. December 5th." (emphasis added)). Indeed, it is a remarkable example of the baselessness of defendants' summary judgment arguments that they cited Mr. Wayne's testimony in order to assure the Court that this fact is purportedly undisputed.

The reality is that Mr. Wayne remains in restrictive housing, under the conditions set forth in the Second Amended Complaint. The only time he is out of his cell and unrestrained, he is put in a small cage by himself to "exercise" – but without any exercise equipment. Defs' Ex. 1 at 71:13-23. He is still subject to strip searches every time he leaves his cell. Defs' Ex. 6 at 24-63:6. He has been in restrictive housing for *over six years* and has not received a misconduct in almost *four*. *See* Plf's Ex. 2 (8.6.2020 PRC Review), Defs' Ex. 14. As discussed further herein, the

_____

of what is or is not solitary confinement. Defs' Ex. 20 at 12:24, 13:12-14:4, 87:9-24; Defs' Ex. 6 at 102:16-20, 104:14-18, 106:19-107:3; Defs' Ex. 8 at 26:1-4, 26:7-10.

duration and conditions of his confinement are atypical and significant hardships that violate his Eighth Amendment right to be free from cruel and unusual punishment. Defendants continue to fail to provide him with the due process guaranteed by the Constitution and Supreme Court precedent.

Until Mr. Wayne's constitutional rights are no longer being violated, he will have a live claim for declaratory and injunctive relief. His claims simply are not moot.

Further, defendants' argument that "[a]t minimum, Commonwealth Defendants, Wetzel, Little, Bickell, and Ferguson can no longer take action as they are all retired and no longer work at the Department of Corrections," Defs' Br. at 14, is not a basis for rendering Mr. Wayne's claims moot. Mr. Wayne's claims for injunctive and declaratory relief against defendants in their official capacities automatically transfer to their successor; they do not become moot. Fed. R. Civ. P. 25(d).

### B. Defendants' motion for summary judgment should be denied because there are numerous disputed issues of material fact related to the elements of his § 1983 claims.

Summary judgment is only appropriate if the movant carries its burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *CNX Midstream Devco I LP v. Applied Constr. Sols., Inc.*, 2021 WL 3930688, at *3, 11 (W.D. Pa. Sept. 21, 2021) ("[T]he moving party bears the initial burden of identifying evidence which demonstrates the *absence* of a genuine issue of a material fact." (emphasis added)). In conducting that analysis, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in its favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotations and citations omitted).

6

### 1.   Defendant Ferguson had personal involvement in the alleged wrongdoing.

Liability may be established by showing that a defendant personally directed or, with actual knowledge, acquiesced in wrongful conduct. *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)); ECF No. 41 at 9. Defendants admit that Tammy Ferguson "had final authority on the placement, continuation, or removal of inmates from the [Restricted Release List], from April 2023 until November 2023," but argue that "she never reviewed Plaintiff for placement, continuation, or removal from the RRL because he was not up for his annual review." Defs' SOF ¶ 87.

Defendants miss the point.  Ms. Ferguson has had the authority and responsibility to assess and determine Mr. Wayne's placement for roughly the last eight months.  Indeed, Mr. Wayne was "up for" an annual review during this period when Ms. Ferguson was responsible but failed to act. Her failure constitutes personal involvement. Plaintiff contends that his annual review should have been completed by September 2023. [2]  But even calculating one year from EDSI Bickell's final approval of Mr. Wayne's 2022 review, he was up for his 2023 review by November 7. According to defense counsel's representations, Ms. Ferguson did not retire until November 25, 2023. Thus, the record facts show that Ms. Ferguson was responsible for the failure to conduct a required review while she was responsible.

Second, as EDSI, Ms. Ferguson had authority to maintain or change Mr. Wayne's conditions of confinement. Defs' Ex. 9 at DOC0000043. Third, she had actual knowledge of his

---

[2] Mr. Wayne's RRL reviews are difficult to track, but occurred as follows: His 2019 RRL review had Defendant Wetzel's signoff by September of that year. *See* Plf's Ex. 3 at DOC-235 (2019 RRL Form). His 2020 review never received final approval from then-Secretary Wetzel. Plf's Ex. 3 at DOC-0000229 (2020 RRL Form). His 2021 review, while not being distributed to DOC staff as required, was signed by Defendant Wetzel on June 16, 2021. *Id.* at DOC-0001483 (2021 RRL Form). His 2022 review was ready for EDSI approval by August 2, 2022, but EDSI Bickell did not approve it until November 7, 2022. *Id.* at DOC-0001599 (2022 RRL Review). EDSI Bickell's 2022 signoff was late. Mr. Wayne should have been reviewed in the summer or fall of 2023.

conditions because she reviewed Mr. Wayne in 2020 and 2021 in her capacity as Regional

Deputy Secretary. Plf's Ex. 3 at DOC-0000229, DOC-0001483 (2020 RRL Review, 2021 RRL

Review). She also admitted that she reviewed his file to prepare for her deposition on November

8, 2023, nearly three weeks before her retirement and one day after he was up for his annual

review. Defs' Ex. 6 at 104:19-22.

At a bare minimum, the degree of Ms. Ferguson's personal involvement is a matter of

disputed facts. Summary judgment is thus inappropriate.

### 2. Defendants are not entitled to summary judgment on Mr. Wayne's Eighth Amendment Claim.

Mr. Wayne's Eighth Amendment claim requires a finding that the deprivation of his rights

was objectively serious and that defendants acted with deliberate indifference. *Clark v. Coupe*,

55 F.4th 167, 186 (3d Cir. 2022) (quoting *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020)).

These questions, too, are replete with disputed facts.

### i. The harm to Mr. Wayne is objectively serious.

To satisfy the first prong of this test, Mr. Wayne need only show that "he is incarcerated

under conditions posing a substantial risk of serious harm." *Mammana v. Fed. Bureau of

Prisons*, 934 F.3d 368, 373 (3d Cir. 2019). He does not need to show actual injury. *Porter v.

Pennsylvania Dep't of Corrections*, 974 F.3d 431, 441 (3d Cir. 2020). Further, "it is well

established in both case law and scientific and medical research that prolonged solitary

confinement . . . poses a substantial risk of serious psychological and physical harm." *Id.*

Moreover, courts have found Eighth Amendment violations for periods of solitary confinement

of five or fewer years. See e.g. *Mayo v. Wetzel*, No. 1:18-CV-878, 2021 U.S. Dist. LEXIS

159845, at *20 (M.D. Pa. Aug. 24, 2021) (finding period of five and a half years in solitary

confinement was sufficiently long to establish Eighth Amendment violation); *Talley v. Clark*,

851 F. App'x 306, 310 (3d Cir. 2021) (finding thirteen month period in solitary confinement

could be sufficiently long to sustain an Eighth Amendment claim); *Palakovic v. Wetzel*, 854 F.3d 209, 216-17, 226 (3d Cir. 2017) (finding multiple thirty day periods in solitary confinement could constitute a violation of the Eighth Amendment). Even if Mr. Wayne's conditions have changed over time, they still bear many similarities to solitary confinement. Mr. Wayne is incarcerated under conditions that are objectively serious.

Defendants argue that there is no evidence of a sufficiently serious deprivation because placement on the Restricted Release List alone does not violate the Eighth Amendment and because the duration of Mr. Wayne's confinement, which they incorrectly characterize as 3.5 years[3], is insufficient to establish an Eighth Amendment violation. Defs' Br. at 15.

At worst there are many disputed facts regarding the actual conditions of Mr. Wayne's confinement throughout this six-year period and continuing to this date. Starting on September 3, 2017, he was confined in a cell alone for 22 hours per day. Eight months ago, he "phased down" to Phase 4 of the IMU and defendants granted him one more hour out of his cell per day. *See* Defs' SOF ¶¶ 60-63. Now, he is confined in a cell alone for at least 21 hours per day. Defs' SOF ¶ 63. He has not been allowed to have any contact visits (including with his lawyers) for over six years. Defs' Ex. 6 at 18:16-19:7. His commissary privileges continue to be restricted. Defs' Ex. 10 at DOC0000013-14. Prison staff contact with him at his cell is conducted through the door. Defs' Ex. 6 at 66:15-68:20. The conditions Mr. Wayne is subject to differ greatly from general population. *See, e.g.*, Defs' Ex. 6 at 61:11-23 (IMU inmates exercise in "modules," which plaintiff contends is a small cage); *id.* at 62:3-11 ("general population inmates could exercise or have activity in their unit, . . . or they could be exercising in unit yards . . ., and then they have

---

[3] Defendants seem to believe that the duration of Mr. Wayne's confinement should be measured from when he filed his original complaint. Defs' Br. at 16. This is obviously incorrect, because Mr. Wayne filed the complaint because he had already been held in restrictive custody for too long. In fact, Mr. Wayne has been in solitary confinement since fall 2017, Plf's Ex. 2. Thus, he has been in this confinement for six years.

their general main yard areas where they can go for exercise, and then, of course, the gymnasiums."). IMU inmates are strip searched when they go to the yard (*id.* at 63:4-6); while general population inmates are not (*id.* at 62:21-23). Inmates in general population are allowed contact visits, while IMU inmates are not. *Id.* at 18:16-19:7 ("The recreation, the amount of recreation out of cell is different, and then just the use of security for restraints for movement within the unit. In addition to that, their access to visitation is done virtually. They typically do not have access to contact visits in the visiting room. Showers, access to showers are more limited. So I would say overall basic activities out of cell are more limited and have additional security presence to complete those activities."). Inmates in the IMU do not ever come into direct contact with another human without restraints on. Defs' Ex. 6 at 66:15-68:20Defendant Ferguson admitted that IMU inmates only come "face to face" with another human without restraints on when a fence or a door sits between them. *Id.*

There is no penological justification for Mr. Wayne's continued incarceration under these conditions – and defendants have offered nothing cogent on this issue.  His last misconduct was in 2020 – over three years ago. In fact, defendants literally contend that he is "thriving." Defs' Br. at 6.

Defendants argue that Mr. Wayne's Eighth Amendment claim fails because he "has never requested any medical treatment whatsoever for any claims of anxiety, depression, or sleep disturbances." Defs' Br. at 25. Yet contrary to defendants' assertions, Mr. Wayne clearly testified that he has spoken to medical staff "all the time" about sleeping conditions and anxiety while he has been assigned to the IMU. He said that "they never took any interest in giving me no – nothing for it. . . . Just write it down and that's that. I mean, I have been complaining about this since 2018." Defs' Ex. 1 at 91:13-23. When asked about whether he has sought any medical treatment for anxiety, he testified "I talked to the doctors and nurses about that. Every time I do

my physical review or whenever I talked to them, but they never pursued to do anything about it. They just leave it the way it is." *Id.* at 92:4-8. In response to defense counsel's question about whether he has discussed medication for any of his conditions, Mr. Wayne testified that a medication suggested by a prison psychologist was denied to him because he is in the IMU:

> Q. Have you discussed medication for any of those conditions with the medical providers?
>
> A. Me and Ms. Stickly talked about this before. The psychologist Ms. Stickly. We talked about this before I think like last year. And she was like you could get – I forgot the name of it, something they said in conversation, you could get that and that way I could sleep. But we can't get that back here. We are not allowed to get that. That's considered to be unauthorized.

*Id.* at 92:9-17. He also submitted a grievance regarding his mental health treatment, which was denied. Plf's Ex. 4 (Grievance 951531).

> **ii.   A jury could find that defendants were deliberately indifferent.**

Despite knowing of the risks of prolonged solitary confinement and knowing that the conditions of Mr. Wayne's confinement posed a substantial risk to his physical and mental health, defendants did not remove him from the RRL or restricted housing. Defendants Wetzel, Ferguson, and Little acknowledged that they knew of the scientific literature related to the risk of substantial harm of solitary confinement, but maintained that Mr. Wayne is not in solitary confinement. Defs' Ex. 6 (Ferguson) at 98:7-11; Defs' Ex. 7 (Wetzel) at 19:12-17; Defs' Ex. 8 (Little) at 24:21-25:1. As the Court acknowledged in its Memorandum Opinion denying Defendants' Motion to Dismiss, ECF No. 41, the Third Circuit "has recognized the increasingly obvious reality that extended stays in solitary confinement can cause serious damage to mental health." *Clark*, 55 F. 4th at 180 (quoting *Palakovic*, 854 F.3d at 226).

At minimum, a jury should answer the question of whether defendants knew or should have known of the potential adverse health effects of the highly restrictive conditions of Mr. Wayne's confinement based on their admissions that they knew of the literature related to the risk of

substantial harm of solitary confinement. A jury should assess the credibility of any witness testimony about their knowledge of attendant risks or harms. A jury should also assess whether the characteristics of Mr. Wayne's highly restrictive confinement are sufficiently similar to the harmful characteristics of solitary.

### 3. Defendants are not entitled to summary judgment on Mr. Wayne's Fourteenth Amendment Claim.

When analyzing a Fourteenth Amendment claim, the first inquiry is whether a plaintiff has a protected liberty interest that has been implicated, and the second is what due process the interest should be afforded. "To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which . . . imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life." *Williams v. Secretary Pennsylvania Dep't Corrections*, 848 F.3d 549, 559 (3d Cir. 2017). To make this determination, the Court must consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Id.* (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)). Whether a plaintiff has received adequate process is a question for the jury to decide. *Shoatz v. Wetzel*, No. 2-13-cv-0657, 2016 WL 595337, at *11 (W.D. Pa. Feb. 12, 2016) ("While it is for the Court to determine what process was due Shoatz, it is for the jury to decide whether he received that process."). Mr. Wayne has a protected liberty interest in not being held in restrictive conditions for a prolonged period of time without penological justification. Several material fact disputes related to whether Mr. Wayne has experienced and continues to experience atypical and significant hardship exist.

### i. Duration

The Third Circuit held in *Williams* that plaintiffs showed atypical hardship where they were isolated for six and eight years, respectively. *Id.* at 561. It wrote that there was "no meaningful distinction between those periods of extreme deprivation and the eight years of

solitary confinement that we concluded in *Shoats* was 'not only atypical, but [ ] indeed unique.'" It also noted that the *Williams* plaintiffs "could have been the most compliant inmates . . . and exhibited no signs that they would endanger themselves or others . . . [t]hey would still have been relegated to death row indefinitely." *Id.* at 562. Again, courts have found Eighth Amendment violations for periods of solitary confinement of five or fewer years. See e.g. *Mayo v. Wetzel*, No. 1:18-CV-878, 2021 U.S. Dist. LEXIS 159845, at *20 (M.D. Pa. Aug. 24, 2021) (finding period of five and a half years in solitary confinement was sufficiently long to establish Eighth Amendment violation); *Talley v. Clark*, 851 F. App'x 306, 310 (3d Cir. 2021) (finding thirteen month period in solitary confinement could be sufficiently long to sustain an Eighth Amendment claim); *Palakovic*, 854 F.3d at 216–17, 226 (finding multiple thirty day periods in solitary confinement could constitute a violation of the Eighth Amendment).

The duration of Mr. Wayne's deprivation for more than six years is not meaningfully different from that experienced by the plaintiffs in *Shoats* and *Williams*. Mr. Wayne's confinement is similarly indefinite. He has been compliant and misconduct-free for over three years, but he is still relegated to the RRL and IMU indefinitely – while defendants suggest that he is soon to be back to general population, they make no assurances, and there is no reason to take their word. Indeed, with Ms. Ferguson's apparent recent departure it appears that currently there is not even an acting EDSI who could remove Mr. Wayne from the RRL. His annual RRL review is overdue. He testified that he is aware of other inmates in the IMU who were moved to Phase 1, but never left the IMU. Defs' Ex. 1 at 65:10-66:68:2. Defendants apparently dispute this, and listed ***without producing*** certain documents that they claim they will use at trial to show that Mr. Wayne is wrong.  Putting aside the troubling practice of listing trial exhibits that were not produced in discovery or when listed (despite the Court's rules mandating an exchange of exhibits), this surely cries out that there is a fact dispute here.

13

The duration of Mr. Wayne's confinement despite being misconduct-free, and Mr. Wayne's observation of others in the IMU who remain there indefinitely, in the context of the defendants' failure to give him adequate due process,[4] would allow a jury to find that his highly restricted confinement is indefinite.

### ii.   Significant hardship

The Third Circuit found that the *Williams* plaintiffs showed significant hardship where they were confined in their cells for twenty-two to twenty-four hours a day. One plaintiff "was placed inside a small locked cage during much of the limited time he was allowed to leave his cell and [another plaintiff] was subjected to invasive strip searches each time he left his cell for exercise." 848 F.3d 549, 563 (3d Cir. 2017). Mr. Wayne is enduring similar conditions to Williams.[5]

Whether Mr. Wayne has experienced atypical and significant hardship depends on several disputed material facts, including the basic question of whether Mr. Wayne has been held

---

[4] *See, e.g.*, the lack of information in his PRC reviews (*see infra* § 3(c) "PRC Reviews"), the lack of clear guidance as to how to progress in the IMU as shown by his "Behavior Improvement Plans" (*id.*), and the lack of adequate annual reviews (*id.* § 3(c) "Restricted Release List Reviews").

[5] *See Williams v. Wetzel*, No. CIV.A. 12-944, 2014 WL 252020, at *6 (W.D. Pa. Jan. 22, 2014) *aff'd sub nom*, *Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017) (Williams' conditions were described in the district court as follows: "daily confinement in the cell for twenty-two hours; confinement in a locked cage during the other two hours of the day for law library, yard, and showers; a limited number of job selections and opportunities; dining alone in the cell; limited selection of games, which can only be played with other inmates through holes in the cage fence; no indoor recreation, cellmates, cigarettes, ice cream, juice, razors, or boots; no virtual televised visits; no vocational programs; medical consults and phone calls at the cell door with no privacy; handcuffed while escorted and getting a haircut; and no visits to commissary (although items are ordered and brought to the prisoner's cell)."). The district court also noted that "the Court is aware, and Defendants' exhibits confirm, that the conditions of confinement for inmates held on death row are the same as those for inmates held in administrative custody for other reasons." *Williams*, 2014 WL 252020, at *6.

14

in confinement. Defendants dispute this, and Mr. Wayne; contends that he was and continues to be held in solitary confinement.

Defendant Bickell first claimed that there is no definition of solitary confinement in the Commonwealth of Pennsylvania, and later defined it as being locked in "this room with nobody coming to see you 24/7." Defs' Ex. 20 at 12:24. When asked what he thought about being locked in a room **22/7** as opposed to 24/7 -- as Mr. Wayne was for an extended period -- Mr. Bickell tried to distinguish between the IMU and solitary confinement. He explained that "an enormous amount of staff" on the IMU distinguishes it from solitary confinement. He recalled that a "daily medical round" is done, that a "daily religious round" is done, and that unit teams visit those held on the IMU. Defs' Ex. 20 at 13:12-14:4. Much of that is incorrect. The DOC manuals do not provide for daily psychological and chaplaincy rounds. Defs' Ex. 9 at DOC0000035. Accordingly, Mr. Wayne's "Inmate Cumulative Adjustment Records" show that he is seen *at most* weekly by a prison staff, but even that is not consistent – sometimes a month goes by without any contact, even in the IMU. Defs' Ex. 17 at DOC0001491.

When Defendant Bickell was shown that Mr. Wayne's Behavior Improvement Plans have not changed over time, he testified as follows:

> Q. So if the goals are all the same through these phases, the three phases that we've looked at for Inmate Wayne that we just stipulated are all the same, why even have the phases?
>
> A. Because they have to show a pattern of positive behavior and nonviolent actions.
>
> Q. But couldn't you just say you have to spend three years in the IMU and, if you exhibit good behavior, we'll let you out at the end?
>
> A. That's ridiculous.
>
> Q. Isn't that what these sheets are showing?
>
> A. No, not to me. That sounds like solitary confinement what you just said to me.

15

Defs' Ex. 20 at 87:9-24.

Defendant Ferguson first testified that the Department of Corrections does have a definition of solitary confinement, then changed her mind. Ms. Ferguson testified that "[s]olitary confinement, as utilized by our agency, is confinement in a cell for more than 23 hours a day." Defs' Ex. 6, at 102:16-20. As such, the difference between "extended restricted housing," which is 22 hours per day, and "solitary confinement" is only one hour of out-of-cell time. *Id.* at 104:14-18. Later, she claimed that the Department of Corrections "does not utilize a definition of solitary confinement." *Id.* 106:19-107:3.

Although Defendant Little maintained that confinement in the IMU does not constitute solitary confinement, he testified that his understanding of solitary confinement was "the environment of 23/1, with really just five hours of access as was done historically with limited contact with others, with staff and inmates." Defs' Ex. 8 at 26:1-4. He also testified that IMU inmates are allowed out of cell "much more than that." *Id.* at 26:7-10.

Even a simple fact issue such as whether Mr. Wayne's cell lights are constantly illuminated is disputed and defendants have been inconsistent about it. When asked whether Mr. Wayne's cell lights are illuminated 24 hours per day, Defendant Bickell testified that RHU inmates can turn their lights on and off as they please. Defs' Ex. 20 at 16:17-25. Defendant Ferguson – the acting EDSI at the time she was deposed – claimed not to know one way or the other. Defs' Ex. at 61:8-10. Defendant Little testified that the lights are kept on at all times for security reasons, but they are dimmed at night by prison staff. Defs' Ex. 8 at 42:12-43:10. Defendant Wetzel testified that night lights are kept on in both general population and RHUs. 47:21-25. This is but one example of where defendants have created their own fact dispute.

The conditions of Mr. Wayne's confinement are atypical i relation to the ordinary incidents of prison life. Each defendant conceded that the conditions Mr. Wayne is subject to

differ greatly from general population. *See, e.g.*, Defs' Ex. 6 at 61:11-23 (persons assigned to IMU exercise in "modules," which plaintiff contends is a small cage); *id.* at 62:3-11 ("general population inmates could exercise or have activity in their unit, . . . or they could be exercising in unit yards . . ., and then they have their general main yard areas where they can go for exercise, and then, of course, the gymnasiums."). IMU inmates receive less showers. Defs' Ex. 20 (Bickell at 17:20-24). IMU inmates are strip searched when they go to the yard (Defs' Ex. 6 at 63:4-6); while general population inmates are not (Defs' Ex. 6 at 62:21-23). Inmates confined to the IMU do not get contact visits, but they would in general population. Defs' Ex. 6 at 18:16-19:7. In fact, inmates in the IMU do not ever come into direct contact with another human without restraints on. Defs' Ex. 6 at 66:15-68:20 (Defendant Ferguson admitted that IMU inmates only come "face to face" with another human without restraints on when a fence or a door sits between them). Indeed, the IMU phases are defined by the restrictions that they impose. Defs' Ex. 10 at DOC0000013-14; Defs' Ex. 20 at 49:6-10.

### iii.    The required procedural protections

Whether Mr. Wayne has received adequate process is a question for the jury to decide. *Shoatz*, 2016 WL 595337, at *11 ("While it is for the Court to determine what process was due Shoatz, it is for the jury to decide whether he received that process."). The Court in *Shoatz* denied a motion for summary judgment where the parties disputed "[w]hether [the DOC's] policies and procedures were followed in a meaningful manner[.]" *Id.*

As the Third Circuit cautioned in *Williams*, "The review that we found adequate in *Shoatz* is not an inconvenient ritual intended to shelter officials from liability so that they may mechanically continue an inmate's confinement on death row after a sentence of death has been vacated without fear of sanction." 848 F.3d at 575-76 (citing *Hewitt v. Helms*, 459 U.S. 460, 477

n.9 (1983)). "Rather, such inmates have a right to *regular and meaningful review* of their continued placement on death row." *Id.* (citing *Wilkinson*, 545 U.S. at 226).

Defendants argue that Mr. Wayne received due process because records show that they conducted semi-regular reviews of Mr. Wayne. According to defendants, these reviews are adequate even where a protected liberty interest is implicated. Defs' Br. at 21. Regardless of whether the reviews were adequate as a matter of law, there are factual disputes between the parties regarding whether these reviews were even conducted appropriately per Department of Corrections policy.

*a) Program Review Committee ("PRC") reviews*

Defendants contend that "the record is replete with meetings between Plaintiff and the [Program Review Committee] to discuss [his] continued status on the RRL and the step-down phases he was to, and did, achieve [sic] to gain more privileges and work his way back to general population." Defs' Br. at 22; *see also* SOF ¶ 28-9 (the PRC "is the deciding body for progressing an inmate through the phases of the IMU" and conducts reviews of Mr. Wayne's status every 90 days). Records of Mr. Wayne's PRC's reviews appear to be created by officials who are conducting an inconvenient ritual. There is rarely any rationale at all provided in the section titled "Program Review Committee Progress Report and Specific Rationale for Continued Placement or for Transfer." *See, e.g.*, Plf's Ex. 5 (PRC Reviews).

In reality, Mr. Wayne's reviews appear to have no impact on his retention in the IMU. Defendants concede that their real position is that Mr. Wayne must complete all phases of the IMU program, no matter how well he has behaved or how long he has been isolated. His purportedly clean bill of mental health, defendants' contention that he has been "thriving," his years without misconducts, and the records of his compliance with the IMU program will not allow him to be recommended for release any earlier than the arbitrary timeline that the IMU

18

handbook proscribes. He is in Phase 3, which must be followed by Phase 2, which must be followed by Phase 1. The reviews in the meantime appear to be but a perfunctory ritual carried out to create a façade of due process protection.

The stated rationale for PRC decisions to continue Mr. Wayne's status in highly restrictive housing since he started the IMU is not a claim that he has a "violent propensity," has misconducts, or exhibits a safety risk to the institution.  Rather, the only rationale provided is that he is assigned to the IMU program. *See*, *e.g.*, *id.* at DOC-0000931-33. Defendant Ferguson admitted that this:

> Q. Based on your review of Mr. Wayne's file, why can't he go back in the general population right now?
>
> A. He needs to complete the IMU program.
>
> Q. So it's not based on anything other than he needs to complete the IMU program?
>
> A. Well, I do believe that he's had a misconduct. I don't know. You may want to provide the misconduct history. I believe that he's had a misconduct maybe within the past two years. And in addition to that, yes, he needs to complete the program. If he completes the program, he'll be reviewed for removal from RRL.
>
> Q. Okay. His last misconduct was in 2020. Does that refresh your recollection?
>
> A. Yeah. So 2020, I mean three years misconduct free is showing some obvious adjustment. And so we continue to work him through the IMU program for potential release to general population.
>
> Q. So he can't be released until the time that he has left on the IMU program runs out; is that right?
>
> A. He will not be released from Restricted Release or the IMU until there's a recommendation made by the local PRC to me for his removal.
>  . . .
> Q. And right now, the PRC wouldn't be able to recommend him to be released from the RRL because he's in Phase 3 of the IMU, right?
> [Defense counsel objection]
>
> A. Correct.

Defs' Ex. 6 at 113:5-114:13; 116:20-117:1.

Defendants insist that the IMU programming and an inmate's ability to progress through phases make the IMU different from solitary confinement, but the acting EDSI, Defendant Ferguson, could not describe what the programming consisted of or how an inmate progresses, beyond repeating that they must complete the program. Defs' Ex. 6 at 53:10-57:6; 114:7-115:1. While defendants contend that Mr. Wayne's fate "has been put into his own hands," Defs' Br. at 14, he does not know exactly how to progress except to "complete the IMU." Defs' Ex. 1 at 53:13-15; 54:3-4. According to the IMU Handbook, "[t]he program will use a progressive six-tiered phase system based on the inmate's adjustment and attainment of goals/objectives noted in Behavior Improvement Plan (BIP)." Defs' Ex. 10 at DOC-0000002. Mr. Wayne was given his first BIP on May 20, 2022, after he had already been in the IMU for over half a year. Plf's Ex. 6 at DOC-0001597 (BIP signed May 20, 2022); Resp. to SOF ¶ 58. The BIP contains sections for long term goals, as well as short term goals to be completed for each phase. *See, e.g.*, Plf's Ex. 6, BIP at DOC-0001587. A quick review of Mr. Wayne's Behavior Improvement Plans progressing from Phase 5 to Phase 3 over the time period of May 20, 2022 through June 27, 2023, reveals that his goals have never changed. They were copied and pasted from one phase to another, while noting that he was "compliant." Plf's Ex. 6.

Again, when Defendant Bickell was shown that Mr. Wayne's Behavior Improvement Plans have not changed over time, he testified that this "sounds like solitary confinement":

> Q. So if the goals are all the same through these phases, the three phases that we've looked at for Inmate Wayne that we just stipulated are all the same, why even have the phases?
>
> A. Because they have to show a pattern of positive behavior and nonviolent actions.

Q. But couldn't you just say you have to spend three years in the IMU and, if you exhibit good behavior, we'll let you out at the end?

A. That's ridiculous.

Q. Isn't that what these sheets are showing? A. No, not to me. That sounds like solitary confinement what you just said to me.

Def's Ex. 20 at 87:9-24; *see also* Plf's Ex. 6 (Bickell Exhibits 6-9).

*b) Restricted Release List reviews*

Department of Corrections policy DC-ADM-802 requires that DC-46 vote sheets be routed to various DOC personnel to review an inmate's status and make a recommendation. Defs' SOF ¶ 9-13. Mr. Wayne's RRL reviews in 2020 and 2021 both suffer from defects that violated Mr. Wayne's constitutional rights. In 2020, certain DOC personnel signed off on the RRL form, but the Secretary of Corrections never did. *See* Plf's Resp to SOF ¶ 10; Plf's Ex. 3 at DOC-0000229 (2020 RRL form). In 2021, there was no annual review sheet circulated to the various personnel of the DOC listed on the form, and no written justification supporting approval or disproval of his continued placement. Plf's Ex. 3 at DOC-0000219 (RRL Annual Review Sheet signed by Defendant Wetzel on June 16, 2021); Defs' Ex. 20 at 101:1-105:11. Instead of initiating a new form in 2021, after inadequately reviewing him in 2020, Defendant Wetzel signed the *2020* form on June 16, 2021, over a year after the other approvals were signed, and wrote "as above" in reference to the reviews by other DOC personnel from 2020. *Id.* This suggests that Mr. Wayne did not receive a review that satisfied due process in 2020, and he did not receive a review that satisfied due process in 2021 either.

Defendants dispute whether Mr. Wayne in fact was given RRL Reviews in 2020 and 2021. When shown the incomplete documentation in 2020 and asked whether he conducted an RRL review of Mr. Wayne in 2020, Defendant Wetzel stated "All I know is this. I don't know what happened in 2020. I don't – I don't know." Defs' Ex. 7 at 69:22-70:1. When asked about how he

could have signed off on Mr. Wayne's RRL status in 2021 based on approvals from other DOC staff from 2020, he testified that "you are trying to act like I made this decision on a vote sheet that is static. And you are ignoring volumes of information right behind it that I'm telling you if you don't have it, then you should have asked for it. That's not my fault. I didn't make a decision on static information from a year and a half ago. That is not accurate." *Id.* at 75:20-76:4.

The process that Mr. Wayne received is a disputed issue of material fact for the jury to decide.

### C. Qualified immunity does not bar Mr. Wayne's claims, and his clearly established rights have been violated.

Finally, defendants argue that they are entitled to qualified immunity as to all claims. The defense of qualified immunity does not apply to Mr. Wayne's requests for injunctive and declaratory relief, so it would not "bar plaintiff's claims against the Commonwealth defendants," Defs' Br. at 25, even if the defense were available to them. As defendants note in their brief, *Harlow v. Fitzgerald* held that qualified immunity protects government officials "from liability for *civil damages* insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818 (1982) (emphasis added)).

Qualified immunity defenses are subject to a two-pronged analysis. First, this court must consider whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S.223, 236 (2009). Second, it must consider whether the right was clearly established at the time of the alleged violation. *Id.* at 201.

For the reasons stated in subsection C, *supra*, Mr. Wayne's due process rights have been violated. Mr. Wayne's procedural due process rights have been clearly established in the Third

Circuit since 2017. *See Porter*, 848 F.3d at 574 (citing *Williams*, 848 F.3d 549 (3d Cir. 2017)); *see also* ECF No. 41 at 24.

For the reasons stated in subsection B, *supra*, Mr. Wayne's Eighth Amendment rights have been violated. As the Court recognized in its Memorandum Opinion denying defendants' Motion to Dismiss on this issue, "we find that 'it is well-established in our Circuit that such prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where . . . [d]efendants have failed to provide any meaningful penological justification.'" ECF No. 41 at 23-24 (quoting *Porter*, 947 F.3d at 451)).

## IV.    CONCLUSION

For the foregoing reasons, plaintiff respectfully requests that the Court deny defendants' summary judgment motion.

Dated: December 12, 2023                    Respectfully submitted,

/s/ Samuel W. Silver
Samuel W. Silver (Pa. I.D. 56596)
ssilver@welshrecker.com
Richard D. Walk, III (Pa. I.D. 329420)
rwalk@welshrecker.com
Welsh & Recker
306 Walnut St.
Philadelphia, PA 19106

## CERTIFICATE OF SERVICE

I, Richard Walk, hereby certify that, on December 12, 2023, the foregoing Opposition to Defendants' Motion for Summary Judgment and related documents were filed electronically using the ECF system and are available for viewing and downloading from the ECF system, and a Notice of Electronic Case Filing was served on all counsel of record registered with the ECF system.

_/s/ Richard Walk_____
Richard Walk