**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN WAYNE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL, GEORGE LITTLE,** | : | |
| **Secretary, Pennsylvania Department** | : | |
| **of Corrections, TABB BICKELL,** | : | |
| **Executive Deputy Secretary for** | : | |
| **Institutional  Operations, Pennsylvania** | : | |
| **Department of Corrections** | : | **NO. 21-4209** |

<u>**MEMORANDUM OPINION**</u>

**SAVAGE, J.**                                                      **August 7, 2024**

Plaintiff John Wayne had been in restricted confinement in various Pennsylvania State Correctional Institutes (SCIs) for the past seven years. He alleges the conditions of confinement were a form of cruel and unusual punishment prohibited by the Eighth Amendment.  Although his custodial status had been reviewed periodically, he claims the process was perfunctory and not meaningful.  He claims that as a result, he was denied due process guaranteed by the Fourteenth Amendment. He filed this action seeking damages and an injunction enjoining the defendants from continuing to hold him in those conditions.   Because he was transferred to general population after successfully completing a reintegration program, he now only claims damages.

Defendants move for summary judgment.  They contend that the undisputed facts establish that his conditions of confinement resulting from his disciplinary history were not so restrictive as to violate the Eighth Amendment.   Furthermore, they claim his confinement status was reviewed periodically and adjustments were made.

We conclude that the undisputed facts establish that Wayne's conditions of confinement imposed as a result of his assaultive behavior were not so restrictive or

atypical to constitute cruel and unusual punishment in violation of the Eighth Amendment. Further, Wayne was not deprived of his right under the Fourteenth Amendment to procedural due process in his placement with restrictive conditions.  Therefore, we shall grant the defendants summary judgment.

## Background

### *Wayne's Disciplinary Record*

Wayne has been in custody of the Pennsylvania Department of Corrections (DOC) since 1995 after he was sentenced to death and a concurrent life sentence for two counts of first-degree murder.[1]  On resentencing, his death sentence was vacated and a life sentence imposed on March 15, 2013.[2]

Wayne has accumulated a lengthy disciplinary history of assaultive behavior and has been transferred to various DOC institutions.  On January 17, 2014, he was placed in disciplinary custody for 120 days and transferred from SCI-Graterford to SCI-Huntington after he attempted to stab two inmates.[3]  While at SCI-Huntington, he received another 120 days of disciplinary custody after getting two misconducts for fighting.[4]  He was transferred to SCI-Fayette on September 8, 2016.[5]  Six months later, he was cited for striking an inmate in the head with a lock in a sock, resulting in to the inmate's

---

[1] Statement of Facts of Defs., ["Defs.' SOF"] ¶ 34, ECF No. 73; Pl's Resp. to Defs.' Statement of Facts ["Pl.'s SOF"] ¶ 34, ECF No. 75-1.

[2] Defs.' SOF ¶ 35; Pl.'s SOF ¶ 35; ICSA, ECF No. 73-11 (attached as Ex. 11 to Defs.' SOF).

[3] Defs.' SOF ¶¶ 37-38; Pl.'s SOF ¶¶ 37-38; Misconduct History, ECF No. 73-2 (attached as Ex. 2 to Defs.' SOF); Plaintiff's Cell History, ECF No. 73-3 (attached as Ex. 3 to Defs.' SOF); Pl.'s Tr., 11:5-7, ECF 73-1 (attached as Ex. 1 to Defs.' SOF).

[4] Defs.' SOF ¶¶ 39-40; Pl.'s SOF ¶¶ 39-40.

[5] Defs.' SOF ¶ 40; Pl.'s SOF ¶ 40.

hospitalization.[6]  He received 90 days of disciplinary custody and was transferred to SCI-Albion on March 2, 2017.[7]  At SCI-Albion, he committed two misconducts by striking another inmate with a closed fist on March 27, 2017, and having a homemade weapon on July 11, 2017.[8]  He received 30 days and 90 days of disciplinary custody, respectively.[9]  On September 3, 2017, he incurred three more misconducts for attacking three inmates, which he claims was in self-defense.[10]

Then Secretary Wetzel approved his placement on the Restricted Release List (RRL) on December 22, 2017.[11]  On August 29, 2018, Wayne received another misconduct for throwing feces at a corrections officer and another inmate, resulting in 180 days of disciplinary custody.[12]

In 2018, Wayne was given an annual review of his RRL status.[13]  In early 2019, Wetzel approved continued restrictive placement.[14]  Between July and September 2019, Wetzel again approved continued placement on the RRL and placement in the Positive Outcome Restructuring Through Assessments and Learning (PORTAL) program, a specialized unit for RRL inmates, which was the precursor to the current Intensive

---

[6] Defs.' SOF ¶ 41; Pl.'s SOF ¶ 41.

[7] Defs.' SOF ¶ 42; Pl.'s SOF ¶ 42; *see also* Misconduct History; Pl.'s Cell History.

[8] Defs.' SOF ¶ 43; Pl.'s SOF ¶ 43.

[9] Defs.' SOF ¶ 44; Pl.'s SOF ¶ 44.

[10] Defs.' SOF ¶ 45; Pl.'s SOF ¶ 45; Pl.'s Tr., 25:7-21, 35:5-7, 22-24, 29:8-11; Misconduct History; EOR Summary, DOC 0001644, ECF No. 73-4, (attached as Ex. 4 to Defs.' SOF).

[11] Defs.' SOF ¶ 46; Pl.'s SOF ¶ 46.

[12] Defs.' SOF ¶ 48; Pl.'s SOF ¶ 48.

[13] *See* Defs.' SOF ¶ 50; Pl.'s SOF ¶ 50.

[14] Defs.' SOF ¶ 50; Pl.'s SOF ¶ 50.

Management Unit (IMU) program.[15]  In November 2019, Wayne was transferred to SCI-Pine Grove.[16]

In 2019, Wayne was disciplined for two misconducts for refusing to obey an order and sexual harassment.[17]   On March 5, 2020, while on the RRL and participating in PORTAL, he received a misconduct for throwing a brown liquid "smelling and having the appearance of feces" on a corrections officer.[18]  Wayne claims the substance was coffee and hot chocolate.[19]

On March 6, 2020, Wayne was removed from the PORTAL program.[20]   On April 30, 2020, he received a misconduct for throwing and striking another inmate with feces, resulting in 90 days of disciplinary custody.[21]  He was transferred to SCI-Phoenix on April 8, 2021.[22]

In late 2021, Wayne was placed in the IMU, a relatively new program to provide inmates a path to work toward removal from the RRL and to reenter general population.[23]

---

[15] Defs.' SOF ¶¶ 15, 52; Pl.'s SOF ¶¶ 15, 52.

[16] Defs.' SOF ¶ 53; Pl.'s SOF ¶ 53.

[17] Defs.' SOF ¶ 51; Pl.'s SOF ¶ 51; 2019 Vote Sheet, ECF No. 72-13 (attached as Ex. 13 to Defs.' SOF).

[18] Defs.' SOF ¶ 54; Pl.'s SOF ¶ 54; Pl.'s Tr., 37:9-24; Misconduct History, March 5, 2022 Misconduct, DOC 0000135, ECF No. 73-14 (attached as Ex. 14 to Defs.' SOF).

[19] Pl.'s Tr., 38:2-9.

[20] Defs.' SOF ¶ 55; Pl.'s SOF ¶ 55.

[21] Defs.' SOF ¶ 49; Pl.'s SOF ¶ 49.

[22] Defs.' SOF ¶ 56; Pl.'s SOF ¶ 56.

[23] Defs.' SOF ¶ 56; Pl.'s SOF ¶ 56; 30 Day Review, SCI Phoenix, April 14, 2021, ECF No. 73-16 (attached as Ex. 16 to Defs.' SOF) ["30 Day Review"]; Wetzel Memo, ECF No. 75-9 (attached as Ex. 8 to Mem. of L. of John Wayne in Opp. To Defs.' Mot. for Summ. J., ECF No. 75) ["Pl's. Mem."]; Wetzel Tr., 29:10-17, ECF No. 73-7 (attached as Ex. 7 to Defs.' SOF).

The IMU is comprised of six tiers with privileges added at each tier.[24]  The ultimate goal is release back to general population at the last phase, Phase 1.[25]

Wayne progressed to Phase 4 on July 6, 2022,[26] to Phase 3 on April 5, 2023,[27] and to Phase 2 on January 10, 2024.[28]  In Phase 4, Wayne had the following privileges: exercise two hours a day, seven days a week; three phone calls a week; three tablet/kiosk (email) connections a week; five video visits a week; access to tv and radio; group treatment; unit management and psychological contact; four showers a week; access to a mini law library and recreational books, and meals with two other Phase 4 inmates two times a week.[29] Phase 2 privileges included: three hours daily exercise out of cell, with up to two to three inmates seven days a week; four phone calls a week; four tablet/kiosk connections a week; up to six video visits a month; tv/radio privileges; participation in group treatment; weekly unit management contact and psychological contact; five showers a week; increased spending limit in commissary; group study; access to a mini law library and three recreational books; ability to congregate in small groups for games like chess, checkers and dominoes; ability to participate in employment; and one meal a day with other Phase 2 and 3 inmates.[30]

---

[24] Defs.' SOF ¶ 21; Pl.'s SOF ¶ 21.

[25] Defs.' SOF ¶ 21; Pl.'s SOF ¶ 21.

[26] Defs.' SOF ¶ 60; Pl.'s SOF ¶ 60.

[27] Defs.' SOF ¶ 62; Pl.'s SOF ¶ 62.

[28] Commonwealth Defs.' Suppl. in Supp. of Defs.' Mot. for Summ. J., at 1 ["Response Brief,"], ECF No. 84.

[29] Defs.' SOF ¶ 63; Pl.'s SOF ¶ 63; IMU Handbook, DOC 0000014, ECF No. 73-10 (attached as Ex. 10 to Defs.' SOF); Pl.'s Tr., 64:17-23; 71:13-78:24.

[30] Defs.' SOF ¶ 30; Pl.'s SOF ¶ 30.

Wayne was kept in a restrictive housing unit (RHU) beginning in 2017.  He was on the Restricted Release List (RRL) of inmates who may reenter the general prison population only with the approval of the Executive Deputy Secretary for Institutional Operations (EDSI).[31]  Wayne reentered general population in May 2024.[32]

*DOC Procedures*

Administrative custody is defined by the DOC as "a status of confinement for non-disciplinary reasons that provides closer supervision, control, and protection than is provided in general population."[33]  When an inmate is placed in administrative custody, written notice of the reasons for placement is given to the inmate no later than 24 hours after placement, and if possible, prior to placement.[34]  The inmate has two days to appeal.[35]

An inmate in administrative custody is reviewed every seven days during the first two months, then every 30 days. Inmates in administrative custody may also be placed on the RRL.  Reasons include: the inmate is in danger from someone else in the facility; he is a danger to others in the facility; he is a danger to himself; he is suspected of being involved in a disturbance; placement in general population is dangerous to him; he is an escape risk; he is charged with or under investigation for a violation of facility rules; he has requested the placement; he is held temporarily for another authority; records needed

---

[31] Defs.' SOF ¶¶ 5, 46; Pl.'s SOF ¶¶ 5, 46.

[32] Oral Argument Tr., ["Tr."] July 16, 2024, 10:9-14.

[33] Defs.' SOF ¶ 1; Pl.'s SOF ¶ 1. Disciplinary custody is no different than administrative custody. What it is called depends on the reasons for placement.

[34] Defs.' SOF ¶ 1; Pl.'s SOF ¶ 1; DC-ADM 802, Section 1(B)(6), ECF No. 73-9 (attached as Ex. 9 to Defs. SOF) ["DC-ADM 802"]; Wetzel Tr., 7:4-7.

[35] Defs.' SOF ¶ 3; Pl.'s SOF ¶ 3.

to determine housing needs are unavailable; he is serving life and has advanced to Phase 2; or he was in custody for disciplinary reasons and has completed his disciplinary sentence, but safety concerns compel keeping him in restricted housing.[36]

Placement on the RRL is initiated by the inmate's assigned counselor who documents the reasons supporting an RRL placement together with a psychological review.[37]  The Unit Manager agrees or disagrees with RRL placement and forwards the form to the major of the guard, psychology personnel, the Deputy for Centralized Services, the Deputy for Facility Management, the Facility's Superintendent, the Corrections Classification Program Manager, and the Regional Deputy Secretary.[38]  Each notes agreement or disagreement.[39]  The EDSI reviews the recommendation, interviews the inmate, and makes the final decision on placement.[40]

An inmate's status on the RRL must be reviewed annually by DOC personnel and a psychologist.[41]  Inmates on the RRL can be placed in the IMU to work their way back to general population.[42]  An inmate's status in the IMU must be reviewed by the Program Review Committee ("PRC") every 90 days to consider moving the inmate to a new phase with more privileges.[43]  The PRC must also complete an annual review to evaluate

---

[36] DC ADM 802, Section 1(B)(1).

[37] Defs.' SOF ¶ 9; Pl.'s SOF ¶ 9.

[38] Defs.' SOF ¶¶ 10-11; Pl.'s SOF ¶¶ 10-11.

[39] Defs.' SOF ¶ 10; Pl.'s SOF ¶ 10.

[40] Defs.' SOF ¶¶ 12-13; Pl.'s SOF ¶¶ 12-13.

[41] Defs.' SOF ¶ 6; Pl.'s SOF ¶ 6.

[42] Defs.' SOF ¶ 17; Pl.'s SOF ¶ 17. The PRC or the SL5 Unit Management Team may approve additional privileges, which include placement on the IMU.  DOC ADM 802 Policy, Section 3(A)(9).  The decision is made based on individual needs, safety and security, and the behavioral progress of the inmate. *Id.*

[43] Defs.' SOF ¶ 29; Pl.'s SOF ¶ 29.

continued placement.[44]  As part of the annual review, the EDSI must interview the inmate and decide whether to remove the inmate from the RRL.[45]  Although the PRC decides when an inmate moves through the phases, an inmate can only be released from the RRL upon the approval of the EDSI.[46]

Defendants argue that Wayne's claims are moot and that the undisputed evidence does not support a finding that his treatment amounts to cruel and unusual punishment or that he was denied procedural due process.  Wayne contends that the conditions in the RHU are severe enough to support an Eighth Amendment claim and argues the DOC did not follow its policy regarding review of his confinement status, denying him procedural due process.

**Standard of Review**

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).  Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted).  Credibility determinations, the

---

[44] Defs.' SOF ¶ 6; Pl.'s SOF ¶ 6.

[45] Defs.' SOF ¶¶ 12-13; Pl.'s SOF ¶¶ 12-13.

[46] Defs.' SOF ¶ 12; Pl.'s SOF ¶ 12.

drawing of legitimate inferences from facts and the weighing of evidence are matters left to the jury. *In re Asbestos Prod. Liab. Litig. (No. VI)*, 822 F.3d 125, 135 (3d Cir. 2016) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)).

Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Gillispie v. RegionalCare Hosp. Partners Inc.*, 892 F.3d 585, 592 (3d Cir. 2018).

## Analysis

### *Mootness*

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996) (citing *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A court's ability to grant effective relief lies at the heart of the mootness doctrine. *County of Morris v. Nationalist Mvmt.*, 273 F.3d 527, 533 (3d Cir.2001). Thus, "[i]f developments occur during the course of adjudication that eliminate a [petitioner's] personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Blanciak*, 77 F.3d at 698-99.

A claim for injunctive relief is moot where the official can no longer grant injunctive relief. *Spomer v. Littleton*, 414 U.S. 514, 522 (1974). To obtain prospective injunctive relief, a plaintiff must "show that he is likely to suffer future injury from the defendant's conduct." *Richardson v. Bledsoe*, 829 F.3d 273, 278 (3d Cir. 2016) (citing *McNair v. Synapse Grp. Inc.*, 672 F.3d 213, 223 (3d Cir. 2012)).

Wayne was transferred to general population in May 2024.[47]  At oral argument, Wayne's counsel conceded that his claims for injunctive and declaratory relief are moot.[48]

Wetzel, Little, and Ferguson have retired.  When a public officer sued in his official capacity is no longer in the office while an action is pending, the officer's successor is automatically substituted as a party.  Fed. R. Civ. P. 25(d); *Richardson*, 829 F.3d at 290. Laurel Harry is the Secretary of the DOC.  For all claims against Wetzel and Little in their official capacities, she automatically becomes the new defendant.  The new EDSI, Michael Wenerowicz, is automatically substituted as a defendant in this action and replaces former EDSIs Bickell and Ferguson in their official capacities. The official capacity claims for equitable relief against Secretary of Corrections Harry and EDSI Wenerowicz are also moot.

*§ 1983 – Lack of Personal Involvement*

To impose section 1983 liability, the plaintiff must show that the defendant had personal involvement in the wrongdoing.  *Williams v. City of York*, 967 F.3d 252, 261 (3d Cir. 2020).  *Respondeat superior* alone does not give rise to section 1983 liability.  *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  Liability must be demonstrated by showing that the defendant personally directed or, with actual knowledge, acquiesced in the conduct.  *Dooley*, 957 F.3d at 374 (citing *Rode*, 845 F.2d at 1207).  Constructive knowledge is not enough.  The defendant must have had actual knowledge of the conduct.  *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194

---

[47] Tr. 10:13-14.

[48] *Id.* 20:20-25.

(3d Cir. 1995)).

Harry is sued solely in her official capacity.  A state official is immune from suits for damages in his official capacity.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Little delegated final decision-making authority over the RRL to the EDSI one month after becoming Acting Secretary.[49]  He did not review Wayne's file and never made a decision affecting Wayne.[50]  Wayne has not pointed to any evidence to show that Little was personally involved. Hence, because Harry and Little had no personal involvement in Wayne's status, they are entitled to summary judgment.

Tammy Ferguson contends she had no personal involvement in Wayne's status. She was the Acting EDSI from April 2023 to November 25, 2023.[51]  She did not review Wayne's status during her tenure.[52]  But, she should have.

Wayne was entitled to a yearly review.  His 2022 review was completed on August 2, 2022, and approved by EDSI Bickell on November 7, 2022.  Wayne contends that his 2023 review should have been completed in September, but no later than November 7, 2023.  As the EDSI, Ferguson had the responsibility to conduct annual reviews.  Ferguson was Acting EDSI until November 25, 2023.  While she was Acting EDSI, Wayne's status should have been reviewed and was not.  Thus, because she was personally involved in the DOC's alleged failure to afford Wayne timely due process, she is not entitled to summary judgment on the basis of non-involvement.

---

[49] Defs.' SOF ¶ 80; Pl.'s SOF ¶ 80.

[50] Defs.' SOF ¶¶ 79-82; Pl.'s SOF ¶¶ 79-82.

[51] Defs.' SOF ¶ 86; Pl.'s SOF ¶ 86.

[52] Defs.' SOF ¶ 87; Pl.'s SOF ¶ 87.

<u>Eighth Amendment</u>

Wayne claims that he was confined under conditions that violate the Eighth Amendment.  While in the RHU, he was allowed to exercise for one hour a day, five days a week.[53]  In Phase 5 of the IMU, he was confined for 22 hours a day.  In Phases 2-4 of the IMU, he was out of his cell for three hours a day.  Throughout his last six years in the RHU, he had not had a contact visit.[54]

The Eighth Amendment proscribes the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. Prison conditions that deprive inmates of basic human needs and life's necessities are cruel and unusual. *Clark v. Coupe*, 55 F.4th 167, 179 (3d Cir. 2022) (citations omitted); *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 417-18 (3d Cir. 2000). An inmate challenging the conditions of confinement must show both that the deprivation was objectively serious and that a prison official acted with deliberate indifference to the conditions. *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

Whether the harm is objectively serious is measured by society's view of the risk to health and safety, that is, "whether 'it violates contemporary standards of decency to expose anyone unwillingly to such a risk.'" *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 257 (3d Cir. 2010) (emphasis omitted) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  The Eighth Amendment does not require comfortable prisons.  *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  Restrictive or harsh conditions are part of prison life.  *Thomas*,

---

[53] DC ADM 802, Section 3(A).

[54] *Id.*, Section 3(A)(1)(d).

948 F.3d at 139 (quoting *Rhodes*, 452 U.S. at 347). Only conditions that deprive the prisoner of one of life's necessities, such as food, water, clothing, shelter, and medical care, are unconstitutional. *Dongarra v. Smith*, 27 F.4th 174, 178 (3d Cir. 2022) (quoting *Rhodes*, 452 U.S. at 347-48); *see also Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). The conditions must pose a substantial risk of serious harm. *Mammana*, 934 F.3d at 373.

A prisoner must also show that the prison official acted with deliberate indifference to his health or safety. *Thomas*, 948 F.3d at 138. The prison official must actually have known or been aware that the condition created an excessive risk to the prisoner's health or safety. *Id.* (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001)). Actual, not constructive, knowledge is required. A prison official can only be liable if he "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 142 (quoting *Farmer*, 511 U.S. at 837). It is not enough that he should have known. *Id.*

The objective seriousness factor considers the severity of the conditions and the duration of placement. Conditions are sufficiently serious when they result in a "denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Mere placement on the RRL is not enough to support an Eighth Amendment claim. *Sandin v. Conner*, 515 U.S. 472, 483 (1995). "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." *Id.* at 485.

It does not matter what the DOC calls the program. Confinement in restricted housing, whether the restriction is termed solitary confinement or administrative custody, is measured by the same metric – duration and severity. *Thomas*, 948 F.3d at 139; *Clark*,

55 F.4th at 185.  We look at the conditions and restrictions of the confinement – not what it is called.

Wayne likens his conditions to solitary confinement.  As described by him and the defendants, the conditions are more restrictive than those in general population, but they are not so objectively serious to constitute cruel and unusual.  They are not the same as solitary confinement.

Restrictive housing is not solitary confinement.  Inmates in the RHU who are not in a special housing unit are allowed out of their cell one hour a day five days a week.  They are allowed phone calls, radio and tablet access, and television access.[55]  The restrictions serve the penological interest of protecting the inmate from others and other inmates from the inmate.  Placing an inmate with a disciplinary history of assaultive conduct like Wayne in restrictive housing protects other inmates whom the DOC has a duty to protect.  It provides needed control and supervision of an inmate prone to assault.

In the IMU, Wayne was not isolated from other inmates.  Under closer observation with limitations, he was able to socialize and interact with them, communicate with family, and participate in group discussions in the IMU program.  The limitations on those activities did not deprive him of his Eighth Amendment right.  In short, the conditions of his confinement did not pose a risk of serious harm.  They were not cruel and unusual.

The reentry IMU program works. Indeed, in Wayne's case, it worked.  He progressed through Phases 6 through 1 and reentered general population.

Wayne does not challenge the IMU program itself, but only as it was applied to him.  In Phase 2, he was afforded three hours a day out of his cell, one meal a day with

---

[55] *Id.*

other inmates, four phone calls a week, four email connections a week, six video visits a month, television and radio access, group treatment, access to books and recreational activities, and the ability to participate in employment.[56]  He and his fellow inmates could "congregate in small groups for games."[57]  This contact is more limited than that afforded in inmate general population.[58]  But, it is hardly the same as in solitary confinement.

Defendants argue that the time Wayne spent in the RHU was not long enough to support an Eighth Amendment violation.  They claim seven years in restrictive conditions is insufficient time to constitute an Eighth Amendment violation.  Courts have found Eighth Amendment violations where the inmate was in solitary confinement for less than seven years.  For example, periods of five and a half years, *Mayo v. Wetzel*, No. 1:18-CV-878, 2021 WL 11132203, at *7 (M.D. Pa. Aug. 24, 2021); thirteen months, *Talley v. Clark*, 851 F. App'x 306, 310 (3d Cir. 2021); and multiple non-consecutive thirty-day periods, *Palakovic v. Wetzel*, 854 F.3d 209, 216-17, 226 (3d Cir. 2017), have been held to violate the Eighth Amendment.

Wayne was not placed in administrative custody or disciplinary custody indefinitely.  On the contrary, he was placed there for fixed periods of time for each of his misconducts, most of which were for assaultive behavior.  He was serving finite disciplinary placements.  That the accumulation of those periods may have resulted in a lengthy period in the RHU was Wayne's doing, not the DOC's.   His time in the RHU was the result of his misconducts.   Under the circumstances, the duration of his restricted confinement was not inordinately long.

---

[56] Defs.' SOF ¶ 30; Pl.'s SOF ¶ 30.

[57] Defs.' SOF ¶ 30; Pl.'s SOF ¶ 30.

[58] Little Tr., 26:7-10, ECF No. 73-8 (attached as Ex. 8 to Defs.' SOF).

The inmate must show that the conditions pose a substantial risk of serious harm. He need not prove a probable risk of harm – a more demanding standard. *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Chavarriaga*, 806 F.3d at 227). The parties dispute whether his confinement has had a detrimental impact on his mental health. Defendants claim there is no evidence of any negative mental health effects. They point to his most recent psychological evaluation where he denied mental health issues. Defendants emphasize that he has not alleged deprivation of healthcare.

Wayne claims he has psychological and sleep disturbances. He testified that he has spoken to prison staff about sleeping conditions and anxiety, and medical personnel ignored his complaints. He contends he was denied medication because he was in the IMU. His grievance regarding his mental health treatment was denied. He testified that he had spoken to medical staff "all the time" about sleeping conditions. As he explained, "they never took any interest in giving me no – nothing for it. Just write it down and that's that. I mean, I have been complaining about this since 2018."[59] When asked whether he has sought any medical treatment for anxiety, he testified "I talked to the doctors and nurses about that. Every time I do my physical review or whenever I talked to them, but they never pursued to do anything about it. They just leave it the way it is."[60] Wayne also testified that he was denied a medication mentioned by a prison psychologist because he

---

[59] Pl.'s Tr., 91:13-23.

[60] *Id.* at 92:4-8.

is in the IMU.[61]   However, he testified only that he could not "get" the medication.   He does not claim he was prescribed medication and was refused it.

DOC records demonstrate otherwise.   He submitted a grievance alleging that he was denied treatment for stress and a sleeping disorder. It was denied because his complaints had not been ignored.   He had been seen by medical staff on six different occasions in 2021.   He appealed the denial. Staff reviewed the concerns and found he had an "A" mental health rating, the highest stability code in the DOC's mental health review system. That classification indicated that he was healthy and did not require mental health services.   Staff responded to the grievance that he had been seen and his sleep issue was addressed. He had a consultation about a possible referral to psychiatry. He was seen again a few months after the consultation. His appeal was denied.[62]

We see the conditions of confinement as Wayne describes them.   There is no dispute about them.   Accepting them as Wayne describes them, we find they were not objectively serious and did not pose a substantial risk of harm.   *See Porter*, 974 F.3d at 441.   Therefore, because the conditions of Wayne's confinement did not rise to the level constituting cruel and unusual punishment, his Eighth Amendment right was not violated.[63]

---

[61] *Id.* at 92:9-17.   *See also* Grievance 951531, ECF No. 75-5, (attached as Ex. 4 to Pl.'s Mem.). ("Q. Have you discussed medication for any of those conditions with the medical providers? A. Me and Ms. Stickly talked about this before. The psychologist Ms. Stickly. We talked about this before I think like last year. And she was like you could get – I forgot the name of it, something they said in conversation, you could get that and that way I could sleep. But we can't get that back here. We are not allowed to get that. That's considered to be unauthorized.").

[62] *Id.*

[63] Having concluded that the conditions of Wayne's confinement did not pose a substantial risk of serious harm, we need not address the deliberate indifference factor.   It is not at issue.   *See Rhodes*, 452 U.S. at 351-52.

<u>Procedural Due Process</u>

Wayne does not challenge the DOC's procedure.  He claims that defendants did not conduct the mandatory status reviews required by the DOC.  He argues this failure violated his due process rights guaranteed by the Fourteenth Amendment.

To prevail on a procedural due process claim, the inmate must establish that he has a liberty interest that is protected by the Fourteenth Amendment. *Holland v. Rosen*, 895 F.3d 272, 297 (3d Cir. 2018) (citations omitted); *see also Montanez v. Sec'y Dep't of Corr.*, 773 F.3d 472, 482 (3d Cir. 2014) (quoting *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 663 (3d Cir. 2011)). If it is a protected interest, we must then determine what process is necessary to protect it. *Newman v. Beard*, 617 F.3d 775, 783 (3d Cir. 2010) (citation omitted).

Prisoners do not enjoy the same liberty interests as others do. *See Sandin*, 515 U.S. at 485. Incarceration "brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). "To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Porter*, 974 F.3d at 438 (emphasis omitted) (quoting *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017)).

In determining whether Wayne's custody in the RHU imposed an atypical and significant hardship, we consider "the duration of the challenged conditions" and the severity of the conditions "in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560 (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)).

There is no bright line defining where the duration of segregation becomes atypical. *Williams*, 848 F.3d at 561-62. An inmate sentenced to thirty days in disciplinary confinement does not endure such hardship. *See Sandin*, 515 U.S. at 486. On the other hand, eight years is atypical. *Shoats*, 213 F.3d at 144. The typicality of the duration varies with the conditions of confinement. The more restrictive the conditions, the shorter the time spent under them will be atypical. Conversely, the less restrictive, a longer time may be typical. Wayne has been continuously held in restricted housing for seven years.

As we have found, Wayne's conditions of confinement were not akin to solitary confinement. Nor had he been deprived of necessities. During Phase 3 of the IMU, Wayne spent three hours each day out of his cell. He could eat one meal a day with other inmates. He had access to games, recreational books, and group study. He had radio/tv privileges, four phone calls a week, four email connections a week, and six video visits a month.

Assuming Wayne has a protected liberty interest in being free from the restrictions of the RHU, we conclude that he received adequate procedural protections. DOC policy requires written notice of the reasons for the placement, an appeals process, periodic reviews, and an annual review. This protocol satisfies due process. In *Shoats*, the Third Circuit found that the DOC procedures satisfied due process because the inmate is given a hearing, is informed of the rationale for placement, has a right to appeal, and has a right to be interviewed by the PRC every 30 days. The PRC decision is reviewed by the Superintendent and the Regional Deputy Commissioner. *Shoats*, 213 F.3d at 145-46.

Wayne does not challenge the process. He claims the process was not followed in his case. Specifically, he claims he did not receive the mandatory regular reviews. In

other words, he maintains he has been held in the restrictive IMU without having been afforded the due process mandated by DOC policy.

DOC policy mandates that when an inmate is placed in administrative custody, whenever practical, written notice of the reasons be given to the inmate prior to but no later than 24 hours after placement.  Wayne claims that he did not receive written notice of the reasons for his AC placement because the reason was not listed on a review form. However, Wayne obviously knew that the reason for his placement was his history of violent assaults.[64]  He was placed in administrative custody for his misconducts after disciplinary hearings where the reasons were clear.

DOC policy governs the procedure for RRL placement.  There is evidence that this policy was not strictly followed in Wayne's case.  In 2020, although certain DOC personnel signed off on the RRL form, the Secretary of Corrections did not.[65]  In 2021, there was no annual review sheet and no written justification for continued placement.[66]  Wetzel signed the 2020 form on June 16, 2021, and wrote "as above" in reference to the reviews by other personnel in 2020, instead of generating a new 2021 form.[67]

The procedural deficiencies Wayne points to are insignificant. He received periodic reviews which took into account his history of misconducts.  The reviews also considered his good behavior. His improved behavior resulted in his being placed in the IMU with a path back to general population.  He progressed through each phase and admitted that

---

[64] Pl.'s Tr., 36:11-13.

[65] Defs.' SOF ¶ 10; Pl.'s SOF ¶ 10; 2020 RRL form, DOC-0000229, ECF No. 75-4 at 82-1 (attached as Ex. 3 to Pl.'s Mem.).

[66] 2020 RRL Form, DOC-0000219.

[67] *Id.*

he had control over his moving out of the RHU.[68]  In sum, there is no evidence that he was confined to the RHU longer than he would have been had he received reviews in strict compliance with DOC policy.

The DOC provided procedural protections.  It is true that transfer to general population does not depend only on his progress.  Before recommending release, the PRC reviews not only progress, but also security reports, psychological assessments and "willingness" to be released.[69]  The DOC did so in Wayne's case.  Hence, Wayne's procedural due process rights were not infringed.

The DOC had a duty to review Wayne's status.  That it did not strictly adhere to its review process does not mean he was not afforded meaningful review.  The record reveals that DOC officials may have failed to follow its procedure in every respect.  But, it did review Wayne's placement regularly and meaningfully.  Wayne has not shown that he was kept in the RHU and on the RRL longer than he would have been as a result of the DOC's failure to strictly follow its own review process.

Wayne knew why he was in the RHU.  He was placed there for misconducts after disciplinary proceedings in which he participated.  Thus, because he had notice of the charges and an opportunity to tell his side of the story to the officials deciding whether to place him in the RHU, there was no deprivation of procedural due process that resulted in harm to him.

---

[68] Pl.'s Tr., 87:8-14 ("I know I can't – anything I do, I wasn't going to end up back in IMU.  So if I had a problem, all I can do is report it to authority before things get out of hand. I have to.")

[69] IMU Handbook, DOC 0000004.

*Substantive Due Process*

Defendants argue there can be no Fourteenth Amendment claim where the actions complained of are potentially covered by another amendment.  They are correct.

Wayne's substantive due process claim is barred under the more-specific-provision rule.  "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Porter*, 974 F.3d at 447 (citing *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)).  In cruel and unusual punishment cases, the Due Process Clause does not provide more protection than the Eighth Amendment.  *Id.*, at 447-48 (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).  Where both a Fourteenth Amendment and an Eighth Amendment claim challenge the same conduct, and there are no distinct facts that apply only to the substantive due process claim, the due process claim will be dismissed.  *Porter*, 974 F.3d at 448; *see also Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010)).

Wayne has not alleged any specific facts that apply only to his substantive due process claim.  The same conduct challenged in that claim is raised in his Eighth Amendment claim.  Therefore, he cannot proceed with a substantive due process claim.

**Conclusion**

The undisputed material facts show that the conditions of Wayne's restrictive confinement did not constitute cruel and unusual punishment prohibited by the Eighth Amendment.  It is clear that he was afforded due process as guaranteed by the Fourteenth Amendment.  Therefore, the defendants are entitled to summary judgment.